**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL SECURITY COUNSELORS, <br><br><br> Plaintiff, <br><br> v. <br><br> CENTRAL INTELLIGENCE AGENCY, *et al.*, <br><br> Defendants. | Civil Action Nos. 11-443, 11-444, 11-445  (BAH) <br><br> Judge Beryl A. Howell |

<u>**MEMORANDUM OPINION**</u>

The plaintiff, National Security Counselors ("NSC"), brings three related actions against six federal intelligence and defense agencies, claiming numerous violations of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, and seeking declaratory and injunctive relief under the FOIA, the APA, the Declaratory Judgment Act, 28 U.S.C. § 2201, the Mandamus Act, 28 U.S.C. § 1361, and the All Writs Act, 28 U.S.C. § 1651.  The gravamen of the plaintiff's claims is that these intelligence and defense agencies—principally the Central Intelligence Agency ("CIA")— have improperly handled the plaintiff's requests for a variety of information under the FOIA. Although this allegedly improper agency behavior relates to a number of specific FOIA requests made to the defendants, it has manifested more broadly in a series of what the plaintiff alleges to be policies, practices, or standard operating procedures ("SOPs") of the CIA that constitute ongoing violations of the FOIA or the APA.[1]  In essence, the plaintiff alleges a series of policies or practices by the CIA that have endeavored systematically to extinguish FOIA requests at their

---

[1] Although the CIA has a number of co-defendants in No. 11-445, the motions being decided in this opinion only relate to claims against the CIA.

inception, before the agency's duty to search or make withholding decisions are triggered and before the agency must provide administrative remedies.  In their totality, the allegations in these related actions paint a picture of the CIA's desire to minimize the substance of its internal, administrative consideration of FOIA requests by crafting mechanisms that limit FOIA requesters' access to such consideration, which in turn has tested the mettle, commitment, and resources of requesters like the plaintiff.  The primary question presented by the CIA's motions to dismiss the policy-or-practice claims in all three actions is whether such mechanisms are permitted by the FOIA.

## I.   BACKGROUND

The plaintiff in these related actions is a not-for-profit organization located in Arlington, Virginia, which was chartered in July 2009 by an attorney named Kelly McClanahan.[2] According to its website, NSC performs four primary functions:  (1) "to lawfully acquire from the government material related to national security matters and distribute it to the public"; (2) "to use this material in the creation of original publications discussing the respective subjects"; (3) "to advocate for intelligent reform in the national security and information and privacy arenas"; and (4) "to provide a low-cost alternative to certain deserving clients involved in security law or information and privacy law-related proceedings."  *See* NAT'L SEC. COUNSELORS, http://nationalsecuritylaw.org/ (last visited Oct. 17, 2012).  To achieve these

---

[2] Compl. ¶¶ 3, 11, *Nat'l Sec. Counselors v. CIA* ("*NSC I*"), No. 11-443 (Feb. 28, 2011).  Because this opinion addresses the claims in three separate actions brought by the same plaintiff, for purposes of organizational clarity only, the Court will refer to each case in short form as follows:  No. 11-443 will be referred to as "NSC I," No. 11-444 as "NSC II," and No. 11-445 as "NSC III."  Additionally, for the same reasons, the Court will refer to court filings in each case with a numerical prefix that corresponds to each Civil Case Number.  For example, the plaintiff's memorandum in opposition to the defendant's partial motion to dismiss in No. 11-444 will be referred to, for citation purposes only, as "Pl.'s 444 Opp'n."

functions, the plaintiff frequently requests information under the FOIA from government agencies in the defense and intelligence sectors.[3]

The instant actions involve challenges to both specific denials of records as well as overarching policies and practices of the CIA that are alleged to violate the FOIA. The CIA's motions to dismiss currently pending before the Court, however, deal almost exclusively with the overarching policies and practices alleged by the plaintiff. At issue are twelve separate alleged policies or practices of the CIA, which the plaintiff claims are contrary to the CIA's duties under the FOIA. Specifically, the plaintiff alleges that the CIA has policies or practices of:

1. Refusing to recognize assignments of rights in FOIA requests ("Assignment of Rights Policy"). *See* Compl. ¶¶ 19–22, *NSC I*.

2. Refusing to process requests for "aggregate data," *e.g.*, a database listing of FOIA requests by fee category ("Aggregate Data Policy"). *See* FAC ¶¶ 12–16, *NSC II*.

3. Refusing to allow requesters the right of administrative appeal when their FOIA requests are deemed improper ("Administrative Appeals Policy"). *See* FAC ¶¶ 27–31, *NSC II*.

4. Applying an overbroad definition of the "reasonably describes" requirement contained in 5 U.S.C. § 552(a)(3)(A) ("Reasonably Describe Policy"). *See* FAC ¶¶ 57–61, *NSC II*.

5. Failing to follow the requirement in 32 C.F.R. § 1900.12 that, if a FOIA request is deemed improper, the agency must "work with, and offer suggestions to, the potential requester in order to define a request properly" ("Work With Policy"). *See* FAC ¶¶ 72–77, *NSC II*.

6. Imposing the date of the CIA's response letter to a requester as the cut-off date on all FOIA request searches ("Cut-Off Date Policy"). *See* FAC ¶¶ 112–115, *NSC II*.

7. Applying a blanket exemption to all information pertaining to the CIA's processing of FOIA and Privacy Act requests ("Blanket Processing Notes Exemption Policy"). *See* FAC ¶¶ 33–37, *NSC III*.

---

[3] *See, e.g.*, First Am. Compl. ("FAC") ¶¶ 15, 19, 30, *Nat'l Sec. Counselors v. CIA* ("*NSC II*"), No. 11-444 (Mar. 21, 2011), ECF No. 6; First Am. Compl. ("FAC") ¶¶ 36, 80, 97, *Nat'l Sec. Counselors v. CIA* ("*NSC III*"), No. 11-445 (Mar. 21, 2011), ECF No. 7; Pl.'s Opp'n to Def.'s Partial Mot. Dismiss ("Pl.'s 444 Opp'n") at 18, *NSC II*, ECF No. 17.

8. Applying a blanket exemption to all FOIA and Privacy Act reference materials (*e.g.*, training handbooks, manuals, guidelines) ("Blanket Reference Material Exemption Policy").  *See* FAC ¶¶ 79–81, *NSC III*.

9. Categorically issuing *Glomar* responses to requests for information pertaining to FOIA and Mandatory Declassification Review requests referred to the CIA by other agencies ("*Glomar* Response Policy").  *See* FAC ¶¶ 94–98, *NSC III*.

10. Refusing to provide estimated dates of completion for FOIA requests ("Non-Provision of Completion Date Policy").  *See* FAC ¶¶ 100–107, *NSC III*.

11. Refusing to identify records withheld in their entirety during the administrative stage of FOIA processing ("Withheld Document Non-Identification Policy").  *See* FAC ¶¶ 118–122, *NSC III*.

12. Invoking FOIA exemptions on a document level without indicating which exemptions apply to particular redactions at the administrative stage of FOIA processing ("Document-Level Exemption Policy").  *See* FAC ¶¶ 128–133, *NSC III*.

The Court will first discuss the factual allegations related to each of these purported policies or practices before discussing the legal issues presented by the CIA's partial motions to dismiss.

### A.    <u>Assignment of Rights Policy</u>

The plaintiff complains that the CIA refuses to recognize the assignment of rights related to FOIA requests—an assignment necessitated in this particular case by Mr. McClanahan's change in employment.  Prior to chartering NSC, Mr. McClanahan served as the Director of FOIA Operations at another not-for-profit organization called the James Madison Project ("JMP").[4]  According to the plaintiff, it shares with JMP "virtually all the same purposes and interests," except that NSC represents clients and JMP does not.  *See* Pl.'s 443 Opp'n at 25.  Indeed, JMP's stated mission is to "promote government accountability and the reduction of secrecy, as well as to educate the public on issues relating to intelligence and national security through means of research, advocacy and the dissemination of information."  *See* JAMES

---

[4] Pl.'s Opp'n to Def.'s Mot. Dismiss ("Pl.'s 443 Opp'n") at 2–3, *NSC I*, ECF No. 12.

MADISON PROJECT, http://www.jamesmadisonproject.org (last visited Oct. 17, 2012).  On April

10, 2008, JMP submitted a FOIA request to the CIA for eleven articles originally published in

the CIA in-house journal *Studies in Intelligence*.  Compl. ¶ 6, *NSC I*.  On May 14, 2008, the CIA

acknowledged receipt of JMP's request and notified JMP that no fees would be assessed for the

request.  *Id.* ¶ 7.  On February 27, 2009, the CIA released ten of the articles requested by JMP.

Four articles were released in full and six were released with redactions under FOIA Exemptions

1, 2, and 3.  On April 13, 2009, JMP administratively appealed the CIA's invocation of these

exemptions.  *Id.* ¶¶ 8–9.

      Several months after the administrative appeal of the withholding decisions was filed, on

July 31, 2009, Mr. McClanahan left JMP to charter NSC and serve as its Executive Director.  *Id.*

¶ 11.  Because the request for the *Studies in Intelligence* articles were a "pet project[]" of Mr.

McClanahan's, *see* Pl.'s 443 Opp'n at 25, on October 7, 2009, JMP notified the CIA that it was

assigning all rights, benefits and interests in that request to NSC, including the right to "pursue

any administrative or legal methods at [NSC's] disposal" relative to this request and also

"surrendering any claims it may have" with respect to this request.  *Id.* Ex. Q at 1, ECF No. 12-

18; Compl. ¶ 12, *NSC I*.  While the administrative appeal of the exemptions claimed on the

*Studies in Intelligence* articles was pending, the plaintiff sent a letter to the CIA on May 25,

2010, requesting that the appeal be amended to include a challenge to a redaction in one of the

articles since the agency had not claimed an exemption for this redaction, and the redaction had

been omitted from the original appeal.  Compl. ¶ 13, *NSC I*.  Prior to sending this letter, the

plaintiff had begun to suspect that the CIA was refusing to recognize JMP's assignment of rights

(the "Assignment"), and the plaintiff therefore requested assistance from the CIA's Office of

Government Information Services ("OGIS") to clarify the CIA's position on the Assignment.  *Id.*

¶ 14.  The OGIS responded to the plaintiff on June 8, 2010, after consulting with the CIA's

Office of General Counsel ("OGC"), informing the plaintiff that it was the CIA's policy not to

accept assignments of rights with regard to FOIA requests and suggesting that the plaintiff would

need to file new FOIA requests for the same records in order to pursue them administratively.

*Id.* ¶ 15.

The plaintiff alleges in Count One of the Complaint in No. 11-443 that it has a legal right

to the information in the *Studies in Intelligence* articles that it requested, by virtue of the

Assignment, and it also challenges the CIA's Assignment of Rights Policy in Count Two,

alleging that the policy is in violation of the FOIA and the APA.  *Id.* ¶¶ 17, 19, 22.  As a result,

the plaintiff seeks a full disclosure of the *Studies in Intelligence* articles originally requested by

JMP,[5] a declaration that the CIA's policy of refusing to recognize assignments of rights violates

the FOIA and/or the APA, and an injunction compelling the CIA to accept assignments of rights.

Compl. at 7, *NSC I.*

## B.  Aggregate Data Policy

The plaintiff complains that the CIA denied five FOIA requests in 2010 for database

records organized into specific categories as detailed in each request, and with respect to four of

these requests the plaintiff claims that the CIA denied any administrative appeal rights.

Specifically, on July 5, 2010, the plaintiff submitted a FOIA request to the CIA seeking "a record

that would indicate the ten individuals responsible for the most FOIA requests submitted (each)

in Fiscal Years 2008, 2009, and 2010."  FAC ¶ 42, *NSC II*; Pl.'s 444 Opp'n Ex. A at 1, ECF No.

17-2.  The CIA responded on July 22, 2010 that it was declining to process this request, stating:

---

[5] The CIA accepted JMP's appeal regarding the *Studies in Intelligence* articles on April 23, 2009, *see* Pl.'s 443
Opp'n Ex. Q at 7, but the parties have provided no information about the status of that appeal or whether the
administrative remedies regarding that request have been exhausted.  The CIA does not contest the issue of
exhaustion, and thus the Court will assume that administrative remedies for that claim have been exhausted.

"We have completed a thorough review of your request and have determined that our record systems are not configured in a way that would allow us to perform a search reasonably calculated to lead to the responsive record without an unreasonable effort."  Pl.'s 444 Opp'n Ex. A at 4.  The CIA's response further stated:  "The FOIA does not require federal agencies to perform research, create records or conduct unreasonable searches through a body of material to see if any of it is related to a particular request."  *Id.*  The plaintiff did not appeal this determination, and it alleges that if it had submitted an administrative appeal, the CIA would have refused to accept it.  FAC ¶ 44, *NSC II*.  In Count Eight of the First Amended Complaint in No. 11-444, the plaintiff maintains that it has a legal right to this requested record and seeks the record's disclosure.  *Id.* ¶ 45.

On August 8, 2010, the plaintiff submitted four FOIA requests to the CIA seeking "database listings of all FOIA requesters from Fiscal Years 2008–2010 according to the fee categories to which CIA assigned them."  *Id.* ¶ 6.  In particular, each of these requests sought "a database listing of all the FOIA requesters from FY 2008–present that you have classified as" either "news media," "educational or scientific," "commercial," or "all other."  *See* Pl.'s 444 Opp'n Ex. B at 1, 4, 7, 10, ECF No. 17-3.  On September 30, 2010, the CIA acknowledged receipt of these requests and assigned them tracking numbers but informed the plaintiff that it was declining to process the requests, stating that "[t]he FOIA does not require federal agencies to create a record, collect information, conduct research, or analyze data."  *Id.* at 14–17.  The plaintiff attempted to administratively appeal these determinations, but the CIA responded on October 21, 2010 that "since we did not provide you with appeal rights, we cannot accept your appeal[s]."  *Id.* at 18–21.  In Count One of the First Amended Complaint in No. 11-444, the

plaintiff maintains that it has a legal right to these requested records and seeks the records' disclosure.  *See* FAC ¶ 10, *NSC II*.

In addition to these five specific denials of FOIA requests, the plaintiff also alleges that the "CIA's refusal to process requests for aggregate data represents an ongoing policy, practice, or standard operating procedure ('SOP')" that violates the FOIA.  *Id.* ¶¶ 12–13.  The plaintiff seeks declaratory and injunctive relief from this alleged Aggregate Data Policy in Counts Two, Three, and Four of the First Amended Complaint in No. 11-444 under the FOIA, the APA, and the Mandamus Act, respectively.  *Id.* ¶¶ 13, 16, 18–20, 22–25.

### C.  Reasonably Describe Policy

Next, the plaintiff complains about two FOIA requests made in 2010 and 2011, respectively, that the CIA declined to process for failure to "reasonably describe" the records sought—a decision by the CIA that the plaintiff claims would also result in a denial of administrative appeal rights, although the plaintiff did not test that result by filing any administrative appeals.  Specifically, on May 13, 2010, the plaintiff submitted a FOIA request to the CIA seeking "a representative sample of [CIA] analytical reports and memoranda presenting psychological analyses or profiles of foreign government officials, terrorist leaders, international criminals, business figures, and other intelligence targets prepared by the Medical and Psychological Analysis Center ('MPAC') or its predecessor Office of Leadership Analysis ('OLA')."[6]  The request specified that a "representative sample" meant:  (a) "[o]nly final official reports or memoranda," (b) no more than twenty reports/memoranda from any given year, (c) "[f]our reports/memoranda for each year . . . for individuals in each category of intelligence target," and (d) "[r]easonable variety in the intelligence targets wherever possible."  Lutz Decl.

---

[6] Decl. of Martha Lutz, Information Review Officer, Director's Area, Central Intelligence Agency ("Lutz Decl.") Ex. M at 1, *NSC II*, ECF No. 20-3.

Ex. M at 1–2.  The CIA responded to this request on June 23, 2010, stating that it could not

accept the request in its current form because it had not "reasonably describe[d]" the records

sought, citing the "breadth and lack of specificity" of the request and "the way in which [the

CIA's] records systems are configured."  *Id.* Ex. N at 1, ECF No. 20-3.  The CIA's response

further encouraged the plaintiff "to refine the scope of your request (such as including a narrower

time frame for, and more specific descriptions of, the information you seek) to enable us to

conduct a reasonable search for responsive information."  *Id.*  Once again, the plaintiff did not

appeal this determination, and it alleges that if it had submitted an administrative appeal, the CIA

would have refused to accept it.  FAC ¶ 49, *NSC II*.  In Count Nine of the First Amended

Complaint in No. 11-444, the plaintiff maintains that it has a legal right to this requested record

and seeks the record's disclosure.  *Id.* ¶ 50.

Relatedly, on February 16, 2011, the plaintiff submitted a FOIA request to the CIA

seeking "all [CIA] records pertaining to the IBM supercomputer named 'Watson.'"  Lutz Decl.

Ex. O at 1, ECF No. 20-3.  The CIA's response to this request on March 2, 2011 was

substantially identical to its response to the plaintiff's May 13, 2010 FOIA request, stating that it

could not accept the request in its current form because it had not "reasonably describe[d]" the

records sought, citing the "breadth and lack of specificity" of the request and "the way in which

[the CIA's] records systems are configured."  *Id.* Ex. P at 1, ECF No. 20-3.  The CIA's response

further encouraged the plaintiff "to refine the scope of your request (such as contracts, if they

exist, which would explain records pertaining to 'Watson') to enable us to conduct a reasonable

search for responsive information."  *Id.*  Yet again, the plaintiff did not appeal this determination,

and it alleges that if it had submitted an administrative appeal, the CIA would have refused to

accept it.  FAC ¶ 54, *NSC II*.  In Count Ten of the First Amended Complaint in No. 11-444, the

plaintiff maintains that it has a legal right to these requested records and seeks the records' disclosure.  *Id.* ¶ 55.

In addition to these two specific denials of FOIA requests, the plaintiff has submitted forty-four other denials by the CIA that rely on the requester's failure to "reasonably describe" the records sought as a basis for declining to process the requests.  Pl.'s 444 Opp'n Ex. E at 1–45, 47–51, 53–55.  The plaintiff alleges that these refusals to process requests that do not "reasonably describe" records sought is related to the fact that "[i]n a majority of these cases, CIA has cited the configuration of its records systems as a disqualifying factor."  FAC ¶ 58, *NSC II*.  These forty-four other denials span nearly four years, from August 1, 2007 to June 27, 2011, and they are in reference to FOIA requests made by the plaintiff as well as a number of other, non-party FOIA requesters, including JMP, MuckRock, Gawker Media, and the National Security Archive.  Pl.'s 444 Opp'n Ex. E at 1–45, 47–51, 53–55.  The plaintiff alleges that, by relying upon "the configuration of its records systems" in concluding that FOIA requests fail to "reasonably describe" records sought, the CIA's "application of FOIA's 'reasonably describe' requirement is significantly and consistently broader than is allowed by FOIA," which the plaintiff claims is a policy or practice of the CIA that violates the FOIA.  FAC ¶¶ 58–59, *NSC II*.  The plaintiff seeks declaratory and injunctive relief from this alleged Reasonably Describe Policy in Counts Eleven, Twelve, and Thirteen of the First Amended Complaint in No. 11-444 under the FOIA, the APA, and the Mandamus Act, respectively.  *Id.* ¶¶ 59, 61, 63–65, 67–70.

### D.   <u>Administrative Appeals Policy and Work With Policy</u>

As discussed above, when the plaintiff attempted to administratively appeal the CIA's refusal to process the plaintiff's August 8, 2010 FOIA requests seeking "database listings of all FOIA requesters from Fiscal Years 2008–2010 according to the fee categories to which CIA assigned them," the CIA refused to accept the plaintiff's administrative appeal.  FAC ¶ 6, *NSC*

*II*; *see also* Pl.'s 444 Opp'n Ex. B at 18–21.  According to the plaintiff, this was not an isolated

incident.  The plaintiff has also submitted examples of similar refusals to allow administrative

appeals by the CIA in response to three other FOIA requests submitted by two non-party FOIA

requesters.  *See id.* Ex C at 2; *id.* Ex. D.  From these examples, the plaintiff alleges that,

whenever the CIA refuses to process a FOIA request that it deems "improper" (*e.g.*, because it

does not "reasonably describe" requested records or it seeks "aggregate data"), the CIA has a

policy or practice of refusing to accept administrative appeals from those decisions.  *See* FAC

¶¶ 28–29, *NSC II*.  The plaintiff claims that this Administrative Appeals Policy violates the

FOIA, and it seeks declaratory and injunctive relief from the alleged policy in Counts Five, Six,

and Seven of the First Amended Complaint in No. 11-444 under the FOIA, the APA, and the

Mandamus Act, respectively.  FAC ¶¶ 29, 31, 33–35, 37–40, *NSC II*.

Similarly, the plaintiff alleges that in the "numerous instances in which CIA has refused

to process a FOIA request it deemed improper," the CIA has endeavored to "'work with, and

offer suggestions to, the potential requester'" in "virtually none of those circumstances."  *Id.* ¶ 74

(quoting 32 C.F.R. § 1900.12(c)).  In support of this claim, the plaintiff cites a series of CIA

responses to "improper" FOIA requests that either "contained only six formulaic suggestions" or

"did not contain any suggestions at all."  *See* Pl.'s 444 Opp'n Ex. E at 1, 3–51, 53–55.  The

plaintiff claims that this behavior constitutes a policy or practice that violates the CIA's own

FOIA regulation, 32 C.F.R. § 1900.12(c), which states:  "Communications which do not meet

the[] requirements [of reasonably describing the records sought and not requiring an

unreasonable search] will be considered an expression of interest and the Agency will work with,

and offer suggestions to, the potential requester in order to define a request properly."  *See* FAC

¶¶ 73–75.  The plaintiff seeks declaratory and injunctive relief from this alleged Work With

Policy in Counts Fourteen, Fifteen, and Sixteen of the First Amended Complaint in No. 11-444

under the FOIA, the APA, and the Mandamus Act, respectively.  *Id.* ¶¶ 75, 77, 79–81, 83–86.

### E.  Cut-Off Date Policy

The plaintiff alleges that "[i]n every response letter [it] has received from CIA, CIA has

imposed an arbitrary cut-off date on the search of the date of the response letter, regardless of the

nature of the request or how long the search is expected to take."  *Id.* ¶ 112.  Although the

plaintiff alleges that the CIA imposes this "arbitrary cut-off date" in response to every FOIA

request it has ever made to the CIA, the plaintiff has also submitted ten examples of such

responses to serve as a "representative sample," all of which were sent to the plaintiff after this

action was commenced.  Pl.'s 444 Opp'n at 14–15; *id.* Ex. G.  The plaintiff alleges that applying

an "arbitrary 'date of response' cut-off date regardless of the nature of the request or the

anticipated length of the search" is a policy or practice of the CIA that violates the FOIA, and the

plaintiff seeks declaratory and injunctive relief from this alleged Cut-Off Date Policy in Count

Twenty-One of the First Amended Complaint in No. 11-444 under the FOIA.  FAC ¶¶ 113, 115,

*NSC II.*

### F.  Withheld Document Non-Identification Policy and Document-Level Exemption Policy

Next, the plaintiff alleges two policies or practices of the CIA that relate to the CIA's

processing of FOIA requests at the administrative level.  First, the plaintiff claims that "[i]n

every case in which CIA has withheld records in their entirety in response to [one of the

plaintiff's] FOIA request[s], . . . CIA has consistently refused to identify any of the records

withheld in their entirety."  FAC ¶ 118, *NSC III*.  The plaintiff alleges that this persistent

"refus[al] to identify withheld records in the administrative stage" is a policy or practice of the

CIA, citing a publicly available CIA training outline created in 2001, which states, "at initial and

at appeal stage, no listing of documents . . . is required," and the plaintiff claims that this Withheld Document Non-Identification Policy violates the FOIA.  *Id.* ¶¶ 118–20.  The plaintiff therefore seeks declaratory and injunctive relief from this alleged policy in Counts Eighteen and Nineteen, of the First Amended Complaint in No. 11-445 under the FOIA and the APA, respectively.  *See id.* ¶¶ 120, 122, 124–26.

The plaintiff also alleges that, "[i]n the majority of cases in which CIA has withheld records in their entirety in response to [one of the plaintiff's] FOIA request[s], . . . CIA has consistently invoked exemptions in the alternative," and that "[i]n every case in which CIA has redacted information from records released in response to [one of the plaintiff's] FOIA request[s], . . . CIA has consistently invoked exemptions on a document-level without indicating which exemptions applied to which particular redactions."  *Id.* ¶¶ 128–29.  The plaintiff further alleges that this activity represents an ongoing policy or practice of the CIA, citing the same training manual it cited in challenging the alleged Withheld Document Non-Identification Policy, which also states that "at the initial and at appeal stage, no . . . putting specific exemptions next to redactions, is required," and the plaintiff claims that this alleged Document-Level Exemption Policy violates the FOIA.  *Id.* ¶¶ 119, 130–31.  The plaintiff seeks declaratory and injunctive relief from this alleged policy in Counts Twenty and Twenty-One of the First Amended Complaint in No. 11-445 under the FOIA and the APA, respectively.  *Id.* ¶¶ 133, 135–37.

G.     **Blanket Processing Notes Exemption Policy and Blanket Reference Material Exemption Policy**

The plaintiff has, through numerous separate FOIA requests, sought two types of records integral to the processing of FOIA requests:  namely, notes prepared and reference materials used by personnel actually processing the requests, but the plaintiff claims that the CIA has categorically declined to disclose either type of record.  Specifically, on December 1, 2009, the

plaintiff submitted a FOIA request to the CIA seeking "copies of all CIA records 'referencing FOIA and Privacy Act requests submitted by [ten listed parties] that contain remarks, comments, notes, explanations, etc. made by CIA personnel or contractors about the processing of these requests (and appeals, if appropriate), the invocation of exemptions, or related matters.'"  FAC ¶ 11, *NSC III*.  This information was to include "analysts' notes made during the processing of the requests, any standard worksheets completed by the analysts, any justifications for exemption invocations," as well as "any correspondence referencing the requests."  *Id.*  The plaintiff refers to this kind of request generally as a "Processing Notes request," and the plaintiff alleges that it has also submitted seventeen other Processing Notes requests to the CIA, and in thirteen of those requests the CIA identified responsive records.  *Id.* ¶¶ 11, 33.  The plaintiff also claims that, in response to twelve of those thirteen FOIA requests involving responsive records, the CIA "has withheld everything from . . . release except for correspondence with the requester."  *Id.* ¶ 33.

Relatedly, the plaintiff submitted a FOIA request on February 6, 2010 for "copies of 'all current training handbooks, manuals, guidelines, checklists, worksheets, and similar documents provided to [CIA] FOIA and Privacy Act analysts."  *Id.* ¶ 56.  The plaintiff refers to this kind of request generally as a "Reference Materials request," and it claims that, in response to FOIA requests seeking such reference materials, the CIA "appl[ies] a blanket exemption" to all such reference materials.  *Id.* ¶ 79.

The plaintiff claims that these patterns of activity by the CIA with respect to FOIA processing notes and reference materials constitute two policies or practices that violate the FOIA by applying an improper blanket exemption to all such materials, thereby preventing their disclosure.  *Id.* ¶¶ 33, 35, 79.  As a result, the plaintiff seeks declaratory and injunctive relief from the alleged Blanket Processing Notes Exemption Policy and Blanket Reference Material

Exemption Policy in Counts Four and Eleven of the First Amended Complaint in No. 11-445, respectively, under the FOIA.  *Id.* ¶ 37, 81.

## H.    *Glomar* **Response Policy**

The plaintiff has submitted nine FOIA requests to the CIA, two of which are at issue in this litigation, seeking records "pertaining to FOIA or Mandatory Declassification Review ('MDR') requests" that had been referred to the CIA by other government agencies.  *Id.* ¶ 94. Based on the two examples of such requests provided by the plaintiff, these requests were similar to a Processing Notes request and sought the same types of information as such requests, except that they sought processing notes from particular FOIA requests, rather than generally seeking all CIA processing notes related to particular requesters.  *See id.* ¶¶ 83, 89.  The plaintiff alleges that, in response to these processing notes requests, the CIA "issued a *Glomar* response to all but one of these requests," and it further alleges that this activity by the CIA constitutes an agency policy or practice.  *Id.* ¶ 94.

A *Glomar* response is "an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information."  *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011).[7]  Thus, a *Glomar* response allows an agency to respond to a FOIA request by neither confirming nor denying the existence of any records responsive to the request, on the grounds that "confirming or denying the existence of records would itself 'cause harm cognizable under a[] FOIA exception.'"  *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)).  The plaintiff alleges that "[t]he fact that any given FOIA or MDR request is referred to

---

[7] *Glomar* responses are "named for the *Hughes Glomar Explorer*, a ship used in a classified Central Intelligence Agency project 'to raise a sunken Soviet submarine from the floor of the Pacific Ocean to recover the missiles, codes, and communications equipment onboard for analysis by United States military and intelligence experts.'" *Roth*, 642 F.3d at 1171 (quoting *Phillippi v. CIA*, 655 F.2d 1325, 1327 (D.C. Cir. 1981)).

CIA by another government agency is not classified," and therefore the plaintiff claims that the

CIA's alleged policy or practice of "authoriz[ing] a *Glomar* response to any request for

information pertaining to FOIA and MDR requests referred to an agency" is an ongoing violation

of the FOIA. *Id.* ¶¶ 95–96. The plaintiff seeks declaratory and injunctive relief from this alleged

*Glomar* Response Policy in Count Fourteen of the First Amended Complaint in No. 11-445

under the FOIA. *Id.* ¶ 98.

## I.       Non-Provision of Completion Date Policy

Finally, the plaintiff alleges that, in conjunction with pending FOIA requests with the

CIA, the plaintiff "asked CIA numerous times in 2009–2010 for estimated dates of completion

for its pending FOIA requests" pursuant to 5 U.S.C. § 552(a)(7)(B). *Id.* ¶ 101. That portion of

the FOIA provides that "[e]ach agency shall . . . provide[] information about the status of a

request to the person making the request," including "an estimated date of on which the agency

will complete action on the request." 5 U.S.C. § 552(a)(7)(B). The plaintiff claims that until

November 2010, the CIA "refused to provide [the plaintiff] with estimated dates of completion."

FAC ¶ 101, *NSC III*.

On November 17, 2010, however, the plaintiff alleges that a representative of the CIA

informed the plaintiff "that CIA's new policy was to inform requesters that the estimated date of

completion for any given request is two years from CIA's date of receipt." *Id.* That same day,

the plaintiff alleges, non-party JMP requested estimated dates of completion from the CIA for

three pending FOIA requests that were more than two years old, specifically invoking 5 U.S.C.

§ 552(a)(7)(B). *Id.* ¶ 102. Even so, the plaintiff alleges that on November 24, 2010, the CIA

responded to JMP's request but "refused to provide the requested estimated dates of

completion." *Id.* The plaintiff also alleges that the CIA similarly refused to provide estimated

dates of completion for pending FOIA requests to a non-party named Michael Ravnitzky, who

requested such dates on November 28, 2010.  *Id.* ¶ 103.  As a result of this pattern of behavior, the plaintiff claims that the CIA's refusal to provide estimated dates of completion, in compliance with 5 U.S.C. § 552(a)(7)(B), represents an ongoing policy or practice of the CIA that violates the FOIA.  *Id.* ¶¶ 104–05.  The plaintiff seeks declaratory and injunctive relief from this alleged Non-Provision of Completion Date Policy in Counts Fifteen, Sixteen, and Seventeen of the First Amended Complaint in No. 11-445 under the FOIA, the APA, and the Mandamus Act, respectively.  *See id.* ¶¶ 105, 107, 109–11, 113–16.

\* \* \*

The plaintiff filed the Complaints in each of these three actions on February 28, 2011, and the plaintiff filed a First Amended Complaint in Nos. 11-444 and 11-445 on March 21, 2011. Pending before the Court are the CIA's partial motions to dismiss in all three actions.  The motions have been brought pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim as well as Rule 12(b)(1) for lack of subject-matter jurisdiction.  For the reasons discussed below, the Court will deny the CIA's Partial Motion to Dismiss in No. 11-443, the Court will grant in part and deny in part the CIA's Partial Motion to Dismiss in No. 11-444, and the Court will grant in part and deny in part the defendants' Partial Motion to Dismiss in No. 11-445.[8]

---

[8] As stated above, although the CIA has a number of co-defendants in No. 11-445, the motions being decided in this opinion only relate to claims against the CIA.

## II.      STANDARDS OF REVIEW

### A.      <u>Motions to Dismiss</u>

In its partial motions to dismiss, the CIA invokes the legal standards for dismissal under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).[9]

When faced with a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), a court has "an affirmative obligation to consider whether the constitutional and statutory authority exist" for it to hear the case. *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (internal quotation marks omitted).  For this reason, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 85 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (internal quotation marks omitted).  When the purported lack of jurisdiction stems from a lack of standing, however, the court "must assume that [the plaintiff] states a valid legal claim." *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003).  The proponent of jurisdiction bears the burden of proving that it exists, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008), and while "the district court may consider materials outside the pleadings," it must "still accept all of the factual allegations in the complaint as true." *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citations and internal quotation marks omitted).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570

---

[9] *See* Mem. in Supp. Def.'s Mot. Dismiss Claims One and Two of Pl.'s Compl. ("Def.'s 443 Mem."), at 1, *NSC I*, ECF No. 7-1; Mem. in Supp. Def.'s Partial Mot. Dismiss ("Def.'s 444 Mem."), at 1, *NSC II*, ECF No. 9-1; Mem. in Supp. Defs.' Partial Mot. Dismiss ("Defs.' 445 Mem."), at 1, *NSC III*, ECF No. 10-1.

(2007); *see also* FED. R. CIV. P. 12(b)(6).  "[A] complaint [does not] suffice if it tenders 'naked

assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678

(2009) (quoting *Twombly*, 550 U.S. at 557).  Instead, the complaint must plead facts that are

more than "'merely consistent with' a defendant's liability"; "the plaintiff [must] plead[ ] factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.* (quoting *Twombly,* 550 U.S. at 557); *accord Rudder v. Williams,* 666

F.3d 790, 794 (D.C. Cir. 2012).  The Court "must assume all the allegations in the complaint are

true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable

inferences derived from the facts alleged."  *Aktieselskabet AF 21. November 2001 v. Fame Jeans*

*Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008) (citations and internal quotation marks omitted).

## B.   FOIA Generally

Congress enacted the FOIA to promote transparency across the government.  *See* 5

U.S.C. § 552; *Quick v. U.S. Dep't of Commerce, Nat'l Inst. of Standards & Tech.,* 775 F. Supp.

2d 174, 179–80 (D.D.C. 2011) (citing *Stern v. FBI*, 737 F.2d 84, 88 (D.C. Cir. 1984)).  The

Supreme Court has explained that FOIA is "a means for citizens to know 'what their

Government is up to.'  This phrase should not be dismissed as a convenient formalism.  It

defines a structural necessity in a real democracy."  *Nat'l Archives & Records Admin. v. Favish,*

541 U.S. 157, 171–72 (2004) (citations omitted).  "The basic purpose of FOIA is to ensure an

informed citizenry, vital to the functioning of a democratic society, needed to check against

corruption and to hold the governors accountable to the governed."  *NLRB v. Robbins Tire &*

*Rubber Co.*, 437 U.S. 214, 242 (1978).  The strong interest in transparency must be tempered,

however, by the "'legitimate governmental and private interests [that] could be harmed by

release of certain types of information.'"  *United Techs. Corp. v. U.S. Dep't of Defense,* 601 F.3d

557, 559 (D.C. Cir. 2010) (quoting *Critical Mass Energy Project v. Nuclear Regulatory*

*Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992)).  Accordingly, Congress included nine exemptions permitting agencies to withhold information from FOIA disclosure.  5 U.S.C. § 552(b).  "These exemptions are explicitly made exclusive, and must be narrowly construed."  *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1262 (2011) (citations and internal quotation marks omitted) (citing *FBI v. Abramson*, 456 U.S. 615, 630 (1982)); *see also Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010).

The D.C. Circuit has also recognized that, separate from claims seeking relief for specific requests made under the FOIA, requesting parties may also assert a "claim that an agency *policy or practice* will impair the party's lawful access to information in the future."  *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988); *accord Newport Aeronautical Sales v. Dep't of the Air Force*, 684 F.3d 160, 164 (D.C. Cir. 2012).  The Court in *Payne* held that a policy-or-practice claim is viable "[s]o long as an agency's refusal to supply information evidences a policy or practice of delayed disclosure or some other failure to abide by the terms of the FOIA, and not merely isolated mistakes by agency officials."  *Payne*, 837 F.2d at 491.  To state a claim for relief under the doctrine articulated in *Payne*, a plaintiff must plausibly demonstrate that:  (1) the agency in question has adopted, endorsed, or implemented a policy or practice that constitutes an ongoing "failure to abide by the terms of the FOIA"; and (2) the plaintiff will "suffer 'continuing injury due to this practice.'"  *See id.* (quoting *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 91 (D.C. Cir. 1986)).

## III.    DISCUSSION

When a federal court is faced with both a challenge to its Article III jurisdiction to hear a claim as well as a challenge to the merits of that claim, the court must address the jurisdictional question before addressing any question of the merits.  *See Steel Co. v. Citizens for a Better*

*Env't*, 523 U.S. 83, 101 (1998); *accord Pub. Citizen v. U.S. Dist. Ct. for the Dist. of Columbia*, 486 F.3d 1342, 1346 (D.C. Cir. 2007) ("'Article III jurisdiction is always an antecedent question' to be answered prior to any merits inquiry." (quoting *Steel Co.*, 523 U.S. at 101)).   Therefore, the Court will first address the CIA's challenges to the plaintiffs' standing to bring certain claims.

### A.   <u>Standing</u>

Article III of the United States Constitution limits the federal judicial power to the resolution of "Cases" and "Controversies."   U.S. CONST. art. III § 2; *see also Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1441–42 (2011) (explaining case-or-controversy requirement).   Several doctrines have "grown up to elaborate" the case-or-controversy requirement, the "most important" of which is standing.   *See Allen v. Wright*, 468 U.S. 737, 750 (1984).

As the Supreme Court has explained, "the irreducible constitutional minimum of standing contains three elements."   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).   First, the plaintiff must have suffered an "injury in fact," *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."   *Id.* (citations and internal quotation marks omitted).   Second, there must be "a causal connection between the injury and the conduct complained of," *i.e.*, the injury alleged must be fairly traceable to the challenged action of the defendant.   *Id*.   Finally, it must be likely that the injury will be redressed by a favorable decision.   *Id.* at 561.   Moreover, when a plaintiff seeks prospective declaratory or injunctive relief, allegations of past harms are insufficient.   *See, e.g.*, *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).   Rather, when declaratory or injunctive relief is sought, a plaintiff "must show he is suffering an ongoing injury or faces an immediate threat of [future] injury."   *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

In these related actions, the CIA raises two issues regarding the plaintiff's standing to sue. The first issue relates only to the claims brought in No. 11-443 regarding the Assignment of Rights Policy. The CIA challenges the plaintiff's standing to bring both the policy-or-practice claim itself, as well as the plaintiff's related claim in Count One of No. 11-443, in which it asks the Court to order the CIA to process the FOIA request that was assigned to it by JMP. The CIA argues that "[b]ecause NSC does not have any enforceable rights or interests in the FOIA requests it references in [its policy-or-practice claim], it cannot establish that the CIA's alleged policy has harmed or will harm 'a legally protected, concrete and particularized interest.'" Def.'s 443 Mem. at 7 (quoting *Lujan*, 504 U.S. at 561). The CIA frames this as a matter of Article III standing, *see id.*, but the premise of the CIA's argument hinges entirely on the merits of the plaintiff's claims that the Assignment is valid and enforceable and that, as a result, the plaintiff has a statutory right, *i.e.*, a "legally protected and particularized" right, to the information sought in the assigned FOIA request. The plaintiff's alleged lack of injury-in-fact stems directly and exclusively from the fact that its name did not appear on the assigned FOIA request when that request was filed,[10] and therefore the CIA's argument presents a question of statutory, rather than Article III, standing. This means that the Court may resolve both the merits and jurisdictional issues of this claim at the outset. *See, e.g.*, *Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725, 728 (D.C. Cir. 2008) (holding that "*Steel Co.*'s bar on hypothetical jurisdiction poses no obstacle" to resolving issues with "both threshold and merits characteristics" when the threshold issues relate to statutory standing). It follows necessarily that if the Assignment is valid and enforceable, the plaintiff has standing to bring the claims articulated in No. 11-443.

---

[10] *See* Def.'s 443 Mem. at 4–5; Def.'s Reply in Supp. of Def.'s Mot. Dismiss Claims One and Two ("Def.'s 443 Reply") at 2, *NSC I*, ECF No. 13 ("On the issue of standing, there is only one contested question before the Court: whether the FOIA permits the assignments of FOIA rights.").

## 1.     *Assignment of Rights to FOIA Requests*

"Anyone whose request for specific information has been denied has standing to bring an action [under the FOIA]." *Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 617 (D.C. Cir. 2006). "The requester is injured-in-fact for standing purposes because he did not get what the statute entitled him to receive." *Id.* at 617–18. The FOIA provides that "each agency, upon any request for records" that is sufficiently specific and made in accordance with published procedures for submitting such requests, "shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). An agency's duties under the FOIA are triggered by a properly framed request for information, and the agency's obligations flowing from that request are with respect to "the requester" of the information. *See id.* § 552(a)(6)(A)(i) (requiring agency to notify "the person making [the] request" whether the agency will comply with the request and "the right of such person to appeal"). The first question raised by this case is whether the right to information, arising from the denial of a person's request for such information, is transferrable to another person after the original request has been made but before administrative remedies have been exhausted.

Courts have typically not allowed anyone other than the person originally requesting information under the FOIA to challenge an agency's action in responding to the request. *See McDonnell v. United States*, 4 F.3d 1227, 1238–39 (3d Cir. 1993) ("We think a person whose name does not appear on a request for records . . . . has no right to receive either the documents, or notice of an agency decision to withhold the documents." (citations omitted)); *Feinman v. FBI*, 680 F. Supp. 2d 169, 173 (D.D.C. 2010) ("[A] plaintiff whose name does not appear on a FOIA request lacks standing to challenge its denial . . . ."); *see also SAE Prods., Inc. v. FBI*, 589 F. Supp. 2d 76, 80 (D.D.C. 2008) (corporate agent requesting information "must adequately identify that he or she is making the FOIA request on behalf of the corporation in order for the

corporation itself to have standing to pursue a FOIA action"); *Three Forks Ranch Corp. v. Bureau of Land Mgmt.*, 358 F. Supp. 2d 1, 3 (D.D.C. 2005) ("[A]n attorney must adequately identify that he is making the FOIA request for his client in order for the client to have standing to pursue a FOIA action."). This Circuit has, however, held that when a FOIA requester dies during the pendency of his request, the rights to pursue the FOIA request may survive and pass to the legal representative of the requester's estate. *See Sinito v. U.S. Dep't of Justice*, 176 F.3d 512, 516–17 (D.C. Cir. 1999) (allowing son of deceased FOIA requester to be substituted as the plaintiff in FOIA litigation if the lower court determined that he was his father's legal representative). Thus, although the D.C. Circuit clearly approved of the transferability of interests in FOIA requests under certain limited circumstances in *Sinito*, the only case in this Circuit thus far to address whether FOIA requests may be *assigned* to a non-requesting party after the request has been made, *Feinman v. FBI*, held that such assignments are not allowed. Closer examination of these two cases is warranted both to reconcile their holdings and to ascertain guidance on the question before the Court.

a) *Sinito and Feinman*

The D.C. Circuit's decision in *Sinito* established a limited right to transfer interests in FOIA requests. That case involved a FOIA request made by a prisoner, seeking information about the criminal investigation that had resulted in his incarceration. *See Sinito*, 176 F.3d at 513. The original requester had exhausted his administrative remedies and filed suit in federal court, but he died in prison before his protracted litigation had been resolved. *Id.* The late prisoner's counsel moved to substitute the prisoner's son as the plaintiff under Federal Rule of

Civil Procedure 25, but the district court denied the motion.[11]  *Id.*  The D.C. Circuit reversed, holding that a FOIA action can survive a requester's death so long as the party substituting for the deceased requester "qualifies under Rule 25(a) as a legal representative eligible to continue the action."  *Id.*

In so holding, the Circuit compared the structure and purpose of the FOIA with other claims that survive death, such as claims under the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), *see Mallick v. Int'l Bhd. of Elec. Workers*, 814 F.2d 674, 677 (D.C. Cir. 1987), or *Bivens* actions, *see Carlson v. Green*, 446 U.S. 14, 24–25 (1980).  *See Sinito*, 176 F.3d at 513–15.  The Court also noted that the strong apparent identity of interests between the proposed substitute party and the original requestor was strong, *id.* at 515 ("[W]e are dealing here not with a vast pool of potential FOIA applicants, any of whom might seek to take [the original requester's] place in the litigation."), and that the original requester had "invested time, and in all likelihood money, in the action," and therefore he "ha[d] a stake in the legal action which transcend[ed] that of 'any person' who might seek the FOIA document," *id.*  Finally, the Court notably drew a favorable comparison between FOIA actions and "action[s] sounding in property rights . . . seeking money rather than information," in which "there would be little doubt" that the action would pass to the claimant's estate.  *Id.*  The Court concluded that, even though a FOIA request seeks information rather than money, information "in many cases has equal value with money or tangible property, and there is no reason, absent statutory preclusion, why it should not similarly survive."  *Id.*

The limits of a FOIA request's transferability was once again addressed in *Feinman*, which involved a FOIA claim brought by a journalist (Feinman) who claimed that she had been

---

[11] Rule 25(a) provides that, when a party to an action dies before a claim is extinguished, "the court may order substitution of the proper party."  FED R. CIV. P. 25(a).  The Rule further provides that "[a] motion for substitution may be made by any party or by the decedent's successor or representative."  *Id.*

assigned the rights to the request in question by the original requester (Beirne) who was a non-party to the lawsuit. *Feinman*, 680 F. Supp. 2d at 170–71.  The FBI had denied Beirne's request without any right of appeal because the request sought information about a suspected terrorist, but no proof of the suspected terrorist's death or a signed privacy waiver had been submitted with the request. *Id.* at 171.  Several months later, Feinman notified the FBI that Beirne had "assigned her rights and interests in the FOIA request to Feinman." *Id.* (internal quotation marks omitted).  Feinman then sued the FBI, claiming that she had a "legal right under FOIA 'to obtain the information she seeks.'" *Id.*  The FBI moved to dismiss on standing grounds because Feinman's "name 'did not appear on the original request." *Id.*

Although the FBI based its arguments for dismissal solely on Feinman's lack of statutory standing, the court held that "strong policy concerns counsel[ed] against permitting assignments" of FOIA requests. *Id.* at 175.  In particular, the court identified two principal policy considerations that counseled against assignments.  First, the court noted that the identity of a FOIA requester is highly relevant in determining whether the requester is required to pay fees, *see* 5 U.S.C. § 552(a)(4)(A), and whether an agency discloses certain privileged documents to "'first-party' requesters who are the very persons protected by the privilege." *Feinman*, 680 F. Supp. 2d at 175.  Thus, the court reasoned, allowing assignment of FOIA requests would potentially allow assignees to "share" (*i.e.*, free-ride upon) an original requester's favorable fee status and would force FOIA administrators to "risk litigation if they subsequently determined that privacy or similar exemptions should be invoked against the third-party assignee." *Id.*  Second, the court stated that allowing assignments of FOIA requests would "multiply opportunities for mistake and mischief" because allowing assignments would potentially allow an individual to "thwart an adversary's search for information by claiming falsely to have been

assigned a previous requester's FOIA rights," and would concomitantly place an undue burden

on FOIA administrators to "verify the validity of an assignment by determining whether it

complies with local law and reflects the original requester's actual intent."  *Id.* at 175–76.

The *Feinman* court also discussed the *Sinito* case at length, distinguishing it on two

grounds.  The court first noted that, unlike the deceased original requester in *Sinito*, the original

requester in *Feinman* (Beirne) "did not invest any time, money, or other effort into pursuing this

litigation" and thus never acquired a stake in the litigation "that might counsel against letting her

investment of litigation resources go to waste."  *Id.* at 174.  The court also noted that, unlike

*Sinito*, "there is no allegation that [Beirne] was incapable of protecting her rights by suing on her

own behalf, or that the relationship between Beirne and Feinman is such that Feinman would

protect Beirne's interests if their interests diverge."  *Id.* at 175.  Ultimately, the *Feinman* court

drew a distinction between a situation "where the plaintiff claims to act *on behalf of* the original

requester," as was the case in *Sinito*, as opposed to "act[ing] in her own right."  *Id.*

b)    *The Applicability of Feinman*

Despite the thoughtful consideration of this issue by the court in *Feinman*, neither the

policy considerations discussed in *Feinman* nor the grounds it cited for distinguishing the

holding in *Sinito* are sufficient to deny the validity of the plaintiff's assignment in this case.

Starting with the *Feinman* court's discussion of *Sinito*, there are a number of major differences

between *Feinman* and the instant case that distinguish *Feinman*'s analysis of *Sinito*.  First and

foremost, this case involves an assignment between two non-profit organizations, rather than an

assignment between individuals.  Recognizing that human beings, rather than corporate entities,

perform the actual work on FOIA requests, an organizational interest in a FOIA request may

often be attached to the work of a single employee or small group of employees who, in turn,

may choose to perform their work for more than one organizational principal while a request is

pending.  Thus, as the plaintiff points out, not honoring the assignability of FOIA requests

between organizations, when the sole reason for the assignment is to keep a request with the

person or persons who have assumed stewardship of that request, could present a large swath of

professional FOIA requesters with a Morton's fork:  either forfeit the freedom to transfer

organizations or forfeit the right to pursue a pending request for information under the FOIA.[12]

The former option would needlessly and severely restrict employees' freedom to change

organizations, while the latter option would undermine the essential purpose of the FOIA.

Relatedly, this case involves two organizations that employed the same individual (Mr.

McClanahan) who had primary responsibility for filing and administratively pursuing the request

at issue.  By virtue of the extensive time and effort Mr. McClanahan has already invested in this

request, *see* Pl.'s 443 Opp'n at 26, it is clear that the plaintiff, through the efforts of its agent, has

acquired a stake in the litigation, unlike the plaintiff in *Feinman*.  Finally, unlike the parties in

*Feinman* who alleged no relationship to each other whatsoever, the common bonds connecting

JMP and NSC—the two organizations share the same Deputy Executive Director (Bradley

Moss), and the Executive Director of JMP (Mark Zaid) also serves on the plaintiff's Board of

Advisors, *see* Pl.'s 443 Opp'n at 24—establishes that their relationship "is such that [NSC]

would protect [JMP's] interests if their interests diverge."  *See Feinman*, 680 F. Supp. 2d at 175.

More fundamentally, the Court believes that *Feinman* did not account fully for the D.C.

Circuit's acknowledgement in *Sinito* that a claim for information and a claim for money or

---

[12] *See* Pl.'s 443 Opp'n at 25–26.  The plaintiff offers the example of a journalist who files a FOIA request in her newspaper's name and then goes to work for a new newspaper.  *See id.*  This situation would apply equally to an academic who works for multiple institutions of higher learning, a lawyer who works for more than one law firm, or any number of other situations that could arise in the context of FOIA litigation.  Another scenario likely to arise in FOIA litigation would be that Corporation A requests information (*e.g.*, relating to a government contract that the corporation did not secure in a bidding process) and, after the request is filed, Corporation A merges with Corporation B, such that Corporation A ceases to exist.  Under the rule articulated in *Feinman*, the successor corporation (Corporation B) would have to start the process all over again, even if the request had been outstanding for several months or years.

tangible property are substantially similar in many cases.  *See Sinito*, 176 F.3d at 515.  The

logical result of the Circuit's reasoning in *Sinito* is that courts should treat FOIA claims like

claims to tangible property unless doing so would contravene public policy or undermine the

"institutional interests" of the judiciary in regulating which parties have standing to sue.  *See*

*id.*[13]  Hence, the Court now turns to the policy considerations raised in *Feinman* to determine

whether assignability of FOIA requests would be appropriate in this case.

The Court certainly agrees with *Feinman* that the identity of a FOIA requester is relevant

to certain aspects of the processing of the request, such as the assessment of fees and the

application of exemptions for privilege or privacy concerns.  Nevertheless, the Court does not

agree that these concerns warrant a blanket prohibition against the assignment of FOIA requests.

Federal agencies are more than capable of developing efficient procedures to ensure that

assignees do not free-ride on an original requestor's fee status or improperly seek private or

privileged information.  For example, agencies could easily require assignees, as a matter of

standard procedure, to submit any information necessary for the agency to update the aspects of

an assigned request that turn on a requester's identity.  If an agency were to determine from this

information that an assignee was not entitled to a fee waiver that had applied to the original

requester or that an assignee did not enjoy "first party" access to the original requester's private

or privileged information, the agency could simply adjust its disposition of the request

accordingly.

---

[13] Under general principles of assignment, the fact that *Sinito* held that FOIA requests survive death could be
considered *prima facie* support for the proposition that such requests are assignable.  This is because survivability of
a right typically indicates that the right is not "purely personal," and thus generally assignable.  *See Barnes Coal
Corp. v. Retail Coal Merchants Ass'n*, 128 F.2d 645, 649 (4th Cir. 1942) (holding that the "modern rule as to
survivability" is that actions for "personal wrongs . . . die with the person," whereas actions "affecting property
right's" survive); *RTC Commercial Loan Trust 1995-NP1A v. Winthrop Mgmt.*, 923 F. Supp. 83, 88 (E.D. Va. 1996)
("purely personal" rights may not be assigned, such as a plaintiff's right to invoke federal diversity jurisdiction by
virtue of his domicile); 6A C.J.S. Assignment § 49 (2012) ("A statutory right of action is generally assignable," but
"a statutory cause of action is not assignable if it is personal to one who holds it and it would not survive his or her
death" (citing *Strickland v. Sellers*, 78 F. Supp. 274 (N.D. Tex. 1948))).

For similar reasons, the Court believes that the potential for an increase in "opportunities for mistake and mischief" resulting from the recognition of assignment rights is minimal.  The *Feinman* court may have been correct in noting that, if FOIA administrators were to take an individual's claim to an assignment of rights "at face value," any stranger could step in to exclude an original requester from the FOIA process against her will.  *See Feinman*, 680 F. Supp. 2d at 175–76.  Even so, nothing would require an agency to take such claims "at face value."  On the contrary, FOIA administrators should require proper documentation of an assignment for it to be recognized—most likely a notarized statement from the original requester that specifically identifies the assignee and the rights assigned.  *Cf.* 31 U.S.C. § 3727(b) (laying out requirements for assignment of money claims against the United States government).

The *Feinman* court was nevertheless concerned that this validation process would constitute an "unreasonable" burden on busy FOIA administrators and that such a burden would be "greater than the minimal burden on any given assignee to make her own FOIA request." *Feinman*, 680 F. Supp. 2d at 176.  That balancing of the equities, however, does not fully account for the realities of FOIA litigation and the central animating purposes of the FOIA.  The burden imposed by requiring an assignee to file a new request and wait at the back of the FOIA line is not "minimal" in most cases.  Although filing a new FOIA request may often involve a small amount of effort or resources, it exacts a *temporal* cost on FOIA requesters that should not be discounted, considering that the FOIA was intended to promote not merely disclosure, but *timely* disclosure.  *See* H.R. Rep. No. 93-876, at 6 (1974) ("[I]nformation is often useful only if it is timely."); *Payne*, 837 F.2d at 494 ("[S]tale information is of little value yet more costly than fresh information ought to be.").  To cite a relevant example, although the CIA takes an average of 143 days to respond to "complex" FOIA requests in which information is granted, it can

sometimes take the better part of a decade,[14] and in this particular case, over four and a half years have passed since the date JMP filed the original FOIA request.

Additionally, the burden imposed on FOIA administrators from processing assigned requests is unlikely to become "unreasonable," and may in fact be more efficient than the alternative. *See, e.g.*, *Sinito*, 176 F.3d at 517 ("[I]t would seem to us more expeditious from the government's point of view to allow the [FOIA] appeal to be pursued on the record already made than to begin the process all over again with a new requestor."). Agencies can and should shift the vast majority of any burden to the assignees themselves, requiring them to submit whatever documentation the agency deems sufficient to validate an assignment, as discussed above. Additionally, the plaintiff's representations indicate that federal agencies are already recognizing FOIA assignments. In particular, the plaintiff documents how several agencies within the United States intelligence and law enforcement communities, including the Department of Justice ("DOJ"), the Federal Bureau of Investigation ("FBI"), and the National Geospatial-Intelligence Agency ("NGA") have formally recognized the assignment of FOIA requests without any indicia of "mistake and mischief" or undue burden. *See* Pl.'s 443 Opp'n at 14–19; *id.* Exs. A, B, I, K, M, N. Although the Court is mindful that the CIA may be able to demonstrate that recognizing assignments would categorically impose an undue burden on its FOIA administrators, that fact is not apparent from the information available in the instant action. The Court holds that the plaintiff's Assignment is valid and enforceable, and therefore the plaintiff has statutory standing to assert the claims alleged in No. 11-443. *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000) ("[T]he assignee of a claim has standing to assert the injury in fact suffered by the assignor.").

---

[14] *See* Cent. Intelligence Agency, *Freedom of Information Act Annual Report* 17, 23 (2011), *available at* http://www.foia.cia.gov/txt/annual_report_2011.pdf. (noting at least ten FOIA requests that have been pending for over seven years).

## 2.   *Standing to Seek Injunctive and Declaratory Relief*

The other standing issue raised by the CIA is with respect to the policy-or-practice claims in Nos. 11-444 and 11-445.  The CIA asserts that the plaintiff lacks standing to assert those policy-or-practice claims because the plaintiff has not sufficiently alleged a future injury that would confer standing to seek prospective declaratory and injunctive relief.  *See* Def.'s 444 Mem. at 6–12; Defs.' 445 Mem. at 6–10.  These claims include each cause of action related to: the Aggregate Data Policy, the Administrative Appeals Policy, the Reasonably Describe Policy, the Work With Policy, the Cut-Off Date Policy, the Blanket Processing Notes Exemption Policy, the Blanket Reference Material Exemption Policy, the *Glomar* Response Policy, the Non-Provision of Completion Date Policy, the Withheld Document Non-Identification Policy, and the Document-Level Exemption Policy.  *See supra* Part I.

When a plaintiff seeks either injunctive or declaratory relief, it "must show [it] is suffering an ongoing injury or faces an immediate threat of injury."  *Dearth*, 641 F.3d at 501. When a plaintiff seeks injunctive or declaratory relief specifically for the purpose of challenging an alleged policy or practice of a government agency, it must also demonstrate that it is "'realistically threatened by a repetition of [its] experience.'"  *Haase v. Sessions*, 835 F.2d 902, 910–11 (D.C. Cir. 1987) (quoting *Lyons*, 461 U.S. at 109).  To plead a "threat of repetition," a plaintiff must make "more than a nebulous assertion of the existence of a 'policy,'" and that it is "likely to be subjected to the policy again."  *Id.* at 911.  This threat must be "real and immediate," or, alternatively, "realistic[]" in nature.  *See Lyons*, 461 U.S. at 109; *Golden v. Zwickler*, 394 U.S. 103, 109 (1969); *see also Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1274 (D.C. Cir. 1994) (observing that the standard for judging likelihood of future injury has been formulated as "likely," "fairly probable," and "certainly impending" and collecting cases).

First, in No. 11-444, the CIA half-heartedly argues that the plaintiff has failed to allege patterns or practices that will continue to be applied in the future.[15]  As the plaintiff points out, "the extent of the Defendant's argument to the contrary is its talismanic attachment of the word 'alleged' to any mention of pattern or practice," and "with one slight exception, Defendant does not actually state that any of the alleged patterns or practices *do not exist*, and in fact spends most of the second half of its brief defending them."  Pl.'s 444 Opp'n at 8–9.  The closest the CIA comes to contesting the plaintiff's allegations of ongoing patterns or practices alleged in No. 11-444 is to argue that the plaintiff "cannot rely on speculation as to how the CIA will react to a future or hypothetical FOIA request."  Def.'s 444 Mem. at 10–11.  Although nearly any allegation about future conduct involves some measure of conjecture in a literal sense, because no mere mortal has the ability to see into the future, the plaintiff is only required to put forth a plausible, "more than . . . nebulous" assertion of the existence of an ongoing pattern or practice to establish standing, and the plaintiff has done so here.  In fact, the plaintiff details, in its opposition briefs, specific instances of conduct by the CIA that the plaintiff claims are manifestations of the alleged policies and practices at issue, most of which are also alleged in the plaintiff's Complaints.[16]  This is more than sufficient to plead the existence of ongoing patterns or practices for the purpose of establishing standing.  *See Jerome Stevens Pharmaceuticals*, 402 F.3d at 1253 (court may consider "materials outside the pleadings" in deciding a motion to dismiss for lack of subject-matter jurisdiction).

---

[15] The standard for pleading the existence of a pattern or practice for purposes of establishing standing to seek prospective relief is not necessarily identical to the standard for pleading a policy or practice to establish the right to *Payne*-style relief.

[16] *See* Pl.'s 444 Opp'n at 10–15; Pl.'s Opp'n to Defs.' Partial Mot. Dismiss ("Pl.'s 445 Opp'n") at 9–11, *NSC III*, ECF No. 18.

The CIA focuses its standing argument on the likelihood that the plaintiff will be subject to these policies in the future.  It argues that, because the plaintiff has not alleged that it regularly submits or intends to submit requests that would implicate the alleged policies or practices, its claimed future injury is insufficient.  *See* Def.'s 444 Mem. at 9–12; Defs.' 445 Mem. at 7.  The CIA relies heavily on three FOIA cases from this Court to support its argument:  *Quick v. U.S. Department of Commerce*, 775 F. Supp. 2d 174 (D.D.C. 2011); *Citizens for Responsibility and Ethics in Washington v. U.S. Department of Homeland Security* ("*CREW/DHS*"), 527 F. Supp. 2d 101 (D.D.C. 2007); and *American Historical Association v. National Archives and Records Administration*, 310 F. Supp. 2d 216 (D.D.C. 2004).  None of these cases, however, aids the CIA's standing argument.

First, with regard to all but one alleged policy or practice, the *Quick* case is immediately distinguishable because, in that case, the record at the summary judgment stage was "clear" that, "even assuming that individuals other than [the plaintiff] may have been subject to the alleged 'pattern or practice,'" the plaintiff had not been subject to it.  *Quick*, 775 F. Supp. 2d at 187.  Although the policy alleged in *Quick* was that the agency "produc[ed] records only after a requester takes the step of commencing a lawsuit," the record had demonstrated that the agency "began processing [the plaintiff's] request long before the commencement of the instant action and consistently and diligently worked towards completing that request in the absence of litigation."  *Id.*  Therefore, *Quick*'s citation to *Lujan* and its statement that the Supreme Court has "foreclosed" the possibility of standing when a plaintiff only offers a "passing allegation that he 'plans to file additional FOIA requests to the [agency] in the future,'" are dicta.  This dicta is itself distinguishable in any event because, as discussed *infra*, the plaintiff has alleged the existence of ongoing FOIA requests directed at the CIA.  Thus, the Supreme Court's admonition

in *Lujan* regarding "'some day' intentions" is inapplicable to the instant actions because the hypothetical "some day" has already arrived.  *See Lujan*, 504 U.S. at 564.

Additionally, all three cases cited by the CIA are distinguishable because in all three cases the plaintiffs never alleged or demonstrated that they had any outstanding FOIA requests (other than the requests challenged in the litigation) that were likely to implicate the alleged policies and lead to future injury.  *See Quick*, 775 F. Supp. 2d at 187 (stating that plaintiff "plan[ned] to file additional FOIA requests to the [defendant] in the future," though none had actually been filed); *CREW/DHS*, 527 F. Supp. 2d at 106 ("Most notably, CREW does not allege anywhere in its complaint or opposition brief that it has a FOIA request pending with the DHS . . . ."); *American Historical Association*, 310 F. Supp. 2d at 228 ("At this stage Plaintiffs have no outstanding requests for presidential records . . . .").  Recent cases have clarified that, where a FOIA requester challenges an alleged ongoing policy or practice and can demonstrate that it has pending claims that are likely to implicate that policy or practice, future injury is satisfied.  *See Citizens for Responsibility & Ethics in Wash. v. U.S. Sec. & Exch. Comm'n* ("*CREW/SEC*"), 858 F. Supp. 2d 51, 60 (D.D.C. 2012) (holding that "outstanding FOIA requests that involve documents that likely will be unavailable due to the challenged policy" are sufficient to allege future injury); *Citizens for Responsibility & Ethics in Wash. v. Exec. Office of the President* ("*CREW/EOP*"), 587 F. Supp. 2d 48, 60–61 (D.D.C. 2008) (holding that, because plaintiffs "each allege that they have FOIA requests for e-mails currently pending with the [defendant agencies] and intend to file future requests," their allegations of future injury were "real and immediate" (quoting *Pub. Citizen v. Carlin*, 2 F. Supp. 2d 1, 6 (D.D.C. 1997))).

The plaintiff has done just this by stating that, as of July 2011, it had already submitted fifteen FOIA requests to the CIA since filing the Complaints in these actions.  *See* Pl.'s 444

Opp'n at 18; Pl.'s 445 Opp'n at 14.  The plaintiff has also displayed a clear intent to continue

filing FOIA requests with the CIA, supported by its consistent habit of filing such requests both

before and after the commencement of this litigation and its stated mission "to obtain records

about national security issues."  *See* Pl.'s 444 Opp'n at 18; Pl.'s 445 Opp'n at 14.  Furthermore,

the Court finds that these ongoing actions and stated intentions to take future action are likely to

implicate the claimed policies and practices at issue because the pending and future requests

appear to be of the same character as the specific requests that form the basis of the plaintiff's

current claims.  *See, e.g.*, Pl.'s 444 Opp'n at 18 (stating that the plaintiff has submitted at least

one other request for "aggregate data"); *id.* at 19 (stating that the plaintiff has submitted two

requests that were determined to "not reasonably describe the records sought").  Therefore, with

the exception of one policy or practice claim discussed below, the Court concludes that these

actions and stated intentions are sufficiently concrete for the Court to conclude that the plaintiff

has alleged a real and immediate threat of future injury resulting from the alleged policies and

practices of the CIA.  Although it is true, as the CIA points out, that "'[t]he existence of federal

jurisdiction ordinarily depends on the facts as they exist when the complaint is filed,'" *Lujan*,

504 U.S. at 569 n.4 (emphasis omitted) (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490

U.S. 826, 830 (1989)), when a plaintiff alleges a future injury, common sense dictates that a

court can and should consider the activities of the plaintiff during and after the time that the

complaint is filed in order to assess the likelihood of such a future injury.

 The one exception to this holding is the alleged Non-Provision of Completion Date

Policy.  With respect to that alleged policy, the plaintiff claims that the CIA has a policy or

practice of refusing to provide estimated dates of completion for pending FOIA requests.  *See*

FAC ¶¶ 99–116, *NSC III*.  In particular, the plaintiff claims that the CIA consistently refused to

supply the plaintiff with estimate dates of completion for its pending FOIA requests "[u]ntil November 2010," and that although the CIA instituted a policy in November 2010 to "inform requesters that the estimated date of completion for any given request is two years from CIA's date of receipt," the CIA has continued to refuse requesters' demands for estimated dates of completion. *Id.* ¶¶ 101–104. The problem, however, is that the plaintiff's factual allegations, in support of the claim that the CIA *continues* to refuse to provide estimated dates of completion since the promulgation of its November 2010 informal guidance, relate solely to FOIA requests filed by other parties. The plaintiff cites requests filed by non-parties JMP and Michael Radvintzky, as well as those non-parties' post-November 2010 requests for estimated dates of completion, to support its claim that the CIA continues to refuse to provide estimated dates of completion. Yet, these allegations fail to allege a cognizable injury against the plaintiff because "even assuming that individuals other than [the plaintiff] may have been subject to the alleged 'pattern or practice,'" the plaintiff has not alleged that it has been subject to the post-November 2010 policy that it seeks to challenge. *See Quick*, 775 F. Supp. 2d at 187. Without an allegation that the plaintiff itself has been subject to the CIA's post-November 2010 Non-Provision of Completion Date Policy, the plaintiff has no standing to bring its claim challenging that policy. Therefore, the causes of action related to the Non-Provision of Completion Date Policy (Counts Fifteen, Sixteen, and Seventeen of the First Amended Complaint in No. 11-445) will be dismissed for lack of subject-matter jurisdiction.

### B. Mandamus and Administrative Procedure Act Claims

Having addressed all of the CIA's standing arguments, the Court will now address the CIA's arguments for dismissing all of the remaining policy-or-practice claims summarized above under Rules 12(b)(1) and/or 12(b)(6).

As discussed above, the plaintiff has elected to seek relief from a number of the alleged policies or practices of the CIA under a variety of legal theories. In addition to the Assignment of Rights Policy and Non-Provision of Completion Date Policy addressed and resolved above, the plaintiff claims ten separate policies or practices that it says violate the FOIA. The plaintiff seeks relief from each of these alleged policies or practices under the FOIA itself, but it also seeks relief from four of the policies or practices under the Mandamus Act,[17] and it seeks relief from seven of the policies or practices under the APA.[18] The plaintiff concedes that, because these claims are duplicative of one another, to the extent it is granted relief at all, such relief will be pursuant to only one of these statutes. *See* Pl.'s 444 Opp'n at 7; Pl.'s 445 Opp'n at 7. The Court will first address the viability of the plaintiff's APA claims and then will discuss the viability of the plaintiff's Mandamus Act claims.

## 1.    *Administrative Procedure Act Claims*

The CIA moves to dismiss the plaintiff's seven remaining APA claims on the basis that the Court lacks subject-matter jurisdiction over those claims. These are the APA claims related to: the Aggregate Data Policy (Count Three of No. 11-444), the Administrative Appeals Policy (Count Six of No. 11-444), the Reasonably Describe Policy (Count Twelve of No. 11-444), the Work With Policy (Count Fifteen of No. 11-444), the Withheld Document Non-Identification Policy (Count Nineteen of No. 11-445), the Document-Level Exemption Policy (Count Twenty-One of No. 11-445), and the APA component of the challenge to the *Glomar* Response Policy

---

[17] The four policies or practices challenged under the Mandamus Act are: the Aggregate Data Policy, the Administrative Appeals Policy, the Reasonably Describe Policy, and the Work With Policy.

[18] The seven policies or practices challenged under the APA include the same four policies or practices challenged under the Mandamus Act, as well as: the Withheld Document Non-Identification Policy, the Document-Level Exemption Policy, and the APA component of the "FOIA/APA" challenge to the *Glomar* Response Policy.

(Count Fourteen of No. 11-445).[19]   The CIA argues that the APA's waiver of sovereign immunity does not apply to the plaintiff's APA causes of action because the availability of a remedy for the plaintiff's policy-or-practice claims under the FOIA and *Payne* means that the plaintiff's corresponding APA claims are not claims "for which there is no other adequate remedy."   *See* Def.'s 444 Mem. at 3–4 (citing 5 U.S.C. §§ 702, 704); Defs.' 445 Mem. at 3–4 (same).   According to the CIA, because "[a]ll . . . of [the plaintiff's] APA claims, and the APA component of its 'FOIA/APA' claim, are based on alleged violations of the FOIA and seek relief available under the FOIA," the APA claims should be dismissed.   Defs.' 445 Mem. at 4.   The plaintiff responds that the CIA's "statement that the mere fact that an APA claim 'is premised on a violation of FOIA' is automatically fatal to that claim is fundamentally incorrect" because "FOIA does not provide an alternative remedy in *all* cases."   Pl.'s 444 Opp'n at 6; Pl.'s 445 Opp'n at 6.   The plaintiff thus argues that if the Court were to "find that the alleged pattern or practice does not fit squarely within the four corners of FOIA's remedies," that would "remove it from *Payne*-style declaratory relief," and therefore no other adequate remedy would be available.   Pl.'s 444 Opp'n at 7; Pl.'s 445 Opp'n at 7.

The CIA is correct that, where a plaintiff claims that an agency has wrongfully withheld agency records in connection with discrete FOIA requests, an APA claim seeking compelled disclosure of the withheld records is precluded.   *See, e.g.*, *Kenney v. U.S. Dep't of Justice*, 603 F. Supp. 2d 184, 190 (D.D.C 2009).   This is because the FOIA grants federal courts jurisdiction to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."   5 U.S.C. § 552(a)(4)(B).   The D.C. Circuit in *Payne*, however, held that "[t]he FOIA imposes no limits on courts' equitable powers in

---

[19] Count Fourteen of No. 11-445, challenging the CIA's alleged *Glomar* Response Policy is captioned as a "FOIA/APA" cause of action, so the Court will only address the APA element of that hybrid claim in this section of the opinion.   *See* FAC at 14, *NSC III*.

enforcing its terms," and where an agency's actions in response to a FOIA request "violate the intent and purpose of the FOIA . . . the courts have a duty to prevent these abuses." *Payne*, 837 F.2d at 494; *see also Wash. Research Project, Inc. v. Dep't of Health, Educ. & Welfare*, 504 F.2d 238, 252 (D.C. Cir. 1974) ("One can imagine circumstances, such as where an agency simply refuses to conform its action to the known requirements of the [FOIA] in order to deter requests for information by repetitive litigation, that would tempt a court to use any or all of the usual weapons in the arsenal of equity."(internal quotation marks omitted)).  Therefore, although the language of the FOIA could be read strictly to limit the equitable powers of federal courts to enjoining the agency from withholding records and ordering production of improperly withheld records, the D.C. Circuit and the Supreme Court have interpreted those equitable powers more broadly.  *See Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 19–20 (1974) (holding that "[t]he broad language of the FOIA," among other factors, demonstrate that "there is little to suggest, despite the Act's primary purpose, that Congress sought to limit the inherent powers of an equity court").

The scope of the equitable powers available under the FOIA is nevertheless still unclear because the D.C. Circuit has yet to specify the breadth of *Payne*-style relief.  The only concrete guidance has been from *Payne* itself, which stated that FOIA policy-or-practice claims extend to any "failure to abide by the terms of the FOIA." *Payne*, 837 F.2d at 491.  This Court has previously held that "where a plaintiff challenges an alleged pattern and practice of violating procedural requirements of FOIA in connection with the processing of the plaintiff's FOIA requests[,] the Court has the power under FOIA and *Payne* to provide the requested declaratory and injunctive remedies." *Muttitt v. U.S. Cent. Command*, 813 F. Supp. 2d 221, 229 (D.D.C. 2011); *see also Feinman v. FBI*, 713 F. Supp. 2d 70, 78 (D.D.C. 2010) (dismissing APA policy-

or-practice claim because "the relief available under FOIA is of the 'same genre' as the relief

available under the APA" (quoting *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009))).

Thus, under *Muttitt*, the Court has the power to enjoin a FOIA procedural violation under the

equitable jurisdiction of the FOIA itself so long as that violation was "in connection with the

processing of the plaintiff's FOIA requests." *Muttitt*, 813 F. Supp. 2d at 229.  Indeed, this Court

stated in *Muttitt* that, even though a policy or practice "would not necessarily result directly in

[the] withholding [of agency records]," it nevertheless falls within the Court's broad equitable

powers under the FOIA.  *Id.* at 228–29 & n.4.

 This conclusion is supported by the fact that it is well settled that courts have certain

equitable powers under the FOIA that extend beyond the literal bounds of 5 U.S.C.

§ 552(a)(4)(B).  Most notably, courts clearly have the power to order an agency to re-run a

search for records where that search was not "reasonably calculated to uncover all relevant

documents.'"  *See Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting *Weisberg v.

U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)).  Although ordering an agency to

conduct an adequate search may indirectly lead to the production of responsive records, *see

Maydak v. U.S. Dep't of Justice*, 254 F. Supp. 2d 23, 44 (D.D.C 2003) (holding that "[a]n

improper withholding *may arise from* an agency's failure to conduct an adequate search"

(emphasis added)), such injunctive relief does not necessarily "enjoin the agency from

withholding agency records" or "order the production of any agency records."  *See* 5 U.S.C.

§ 552(a)(4)(B).  Similarly, remedying procedural violations of the FOIA may not necessarily

lead to the production of withheld responsive records, yet it is concomitantly reasonable to

interpret the jurisdictional grant in 5 U.S.C. § 552(a)(4)(B) to include the power to enjoin

procedural violations of the FOIA when they are connected to specific requests for records.

As in *Muttitt*, for each of the remaining policy-or-practice claims in the instant cases the plaintiff alleges that the CIA has applied the policy or practice to one or more specific FOIA requests made by the plaintiff.  Hence, all of the alleged policies or practices challenged in the instant actions are "in connection with the processing of the plaintiff's FOIA requests."[20] *Muttitt*, 813 F. Supp. 2d at 229.  Additionally, all but one of the policy-or-practice claims alleges a violation of "procedural requirements of the FOIA."  The only exception are the claims related to the Work With Policy (Counts Fourteen, Fifteen, and Sixteen of No. 11-444), which allege a policy or practice of the CIA violating its own FOIA regulation, 32 C.F.R. § 1900.12(c), not the procedural requirements of the FOIA itself.  *See* FAC ¶¶ 71–86, *NSC II*.  Therefore, the Court "has the power under FOIA and *Payne* to provide the requested declaratory and injunctive remedies" with respect to all of the policy-or-practice claims except the claims related to the Work With Policy, which are properly addressed under the APA.  *Muttitt*, 813 F. Supp. 2d at 229.  As a result of this conclusion, APA relief is foreclosed with respect to the Aggregate Data Policy, the Administrative Appeals Policy, the Reasonably Describe Policy, the Withheld Document Non-Identification Policy, the Document-Level Exemption Policy, and the *Glomar* Response Policy because the FOIA itself can provide the plaintiff with an adequate equitable remedy, assuming of course that the plaintiff has stated a claim for relief with respect to each of those policies.  Therefore, all of the plaintiff's APA claims related to those policies—Counts

---

[20] The claims related to the Reasonably Describe Policy (Counts Eleven, Twelve, and Thirteen of No. 11-444), however, could be considered as a more general challenge to agency action.  Those claims challenge the CIA's formal interpretation of the term "reasonably describe" and allege that interpretation is "significantly and consistently broader than is allowed by FOIA."  *See* FAC ¶¶ 58, 63, *NSC II*.  This sort of across-the-board challenge to an agency's formal interpretation of a statute is "typically seen in litigation under the [APA], as the APA expressly provides for such judicial review."  *Bensman v. Nat'l Park Serv.*, 806 F. Supp. 2d 31, 41 (D.D.C 2011).  Nevertheless, although the plaintiff's challenge to the Reasonably Describe Policy may have broader application, it still challenges a policy that is allegedly being applied "in connection with the processing of the plaintiff's FOIA requests" and that is allegedly "violating procedural requirements of FOIA."  *Muttitt*, 813 F. Supp. 2d at 229.  Thus, the Court is satisfied that this sort of challenge is within the Court's jurisdiction under the FOIA, even though it would also clearly fall within the Court's jurisdiction under the APA.

Three, Six, and Twelve of No. 11-444, Counts Nineteen and Twenty-One of No. 11-445, and the APA component of the "FOIA/APA" claim in Count Fourteen of No. 11-445—will be dismissed for lack of subject-matter jurisdiction. Likewise, because the claims related to the Work With Policy challenge conduct outside the Court's FOIA jurisdiction, the Court does not have the power to remedy the FOIA claim related to that policy (Count Fourteen of No. 11-444). Hence, Count Fourteen of No. 11-444 will also be dismissed for lack of subject-matter jurisdiction.

### 2.  *Mandamus Act Claims*

The CIA also moves to dismiss the plaintiff's four remaining Mandamus Act claims on the grounds that the plaintiff has failed to plead a claim for relief under that statute and that the Court lacks subject-matter jurisdiction over those claims. *See* Def.'s 444 Mem. at 5–6; Defs.' 445 Mem. at 5–6. This includes the Mandamus Act claims related to the Aggregate Data Policy (Count Four of No. 11-444), the Administrative Appeals Policy (Count Seven of No. 11-444), the Reasonably Describe Policy (Count Thirteen of No. 11-444), and the Work With Policy (Count Sixteen of No. 11-444). To adequately plead a claim for relief under the Mandamus Act, 28 U.S.C. § 1361, a plaintiff must allege that: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff. *See In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005).[21] The D.C. Circuit has narrowly construed jurisdiction under the Mandamus Act, holding that mandamus-style relief[22] is "'drastic'; it is available only in 'extraordinary situations'; it is hardly ever granted; those invoking the court's mandamus jurisdiction must have a 'clear and indisputable'

---

[21] The D.C. Circuit has held that, to the extent the court must determine whether a "clear and compelling" duty exists, "mandamus jurisdiction under § 1361 merges with the merits" because if no "clear and compelling" duty exists, the claim fails and the court also has no jurisdiction over the claim under 28 U.S.C. § 1361. *See In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc).

[22] The Court refers to it as "mandamus-style relief" because "Rule 81(b) of the Federal Rules of Civil Procedure long ago abolished the writ of mandamus in the district courts," and therefore the Mandamus Act "confers jurisdiction on the district courts over actions 'in the nature of mandamus.'" *In re Cheney*, 406 F.3d at 728–29.

right to relief; and even if the plaintiff overcomes all these hurdles, whether mandamus relief should issue is discretionary."  *In re Cheney*, 406 F.3d at 729; *accord Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980) ("[T]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations.").  Mandamus-style relief is precluded when an adequate alternative remedy exists, even where that alternative remedy is less efficient or less effective than mandamus relief would be.  *See Fornaro v. James*, 416 F.3d 63, 69–70 (D.C. Cir. 2005); *Council for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1532–33 (D.C. Cir. 1983).

The CIA argues that the plaintiff has failed to plead any of the three required elements for any of its claims under the Mandamus Act.  *See* Def.'s 444 Mem. at 5–6; Defs.' 445 Mem. at 5–6.  The plaintiff's only response is to argue that, although its Mandamus Act claims are duplicative of its FOIA and APA claims, "this is not a fatal flaw in and of itself."  Pl.'s 444 Opp'n at 4; Pl.'s 445 Opp'n at 4.  In support of this argument, the plaintiff cites two cases from this Court, which both refused to dismiss mandamus claims at the motion to dismiss stage.  *See* Pl.'s 444 Opp'n at 5 (citing *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 44 (D.D.C 2002) and *CREW/EOP*, 587 F. Supp. 2d at 63); Pl.'s 445 Opp'n at 5 (same). Even assuming that the plaintiff is correct that the duplicity of its mandamus claims "is not a fatal flaw in and of itself," that does not address whether the plaintiff has adequately alleged mandamus claims in the first place.

The plaintiff does not contest that it has failed to satisfy the first two elements of a Mandamus Act claim:  a clear right to relief and a clear duty to act.  Rather, the plaintiff only addresses the CIA's arguments with respect to subject-matter jurisdiction and does not discuss the CIA's argument that the plaintiff has failed to state claims for mandamus-style relief.  *See*

Pl.'s 444 Opp'n at 4; Pl.'s 445 Opp'n at 4.[23]   Indeed, the plaintiff's citation to *Judicial Watch, Inc. v. National Energy Policy Development Group* presumes that the plaintiff has already pleaded claims for mandamus-style relief.  Although that case held that "it would be premature and inappropriate to determine whether the relief of mandamus will or will not issue" at the motion to dismiss stage, that holding was still premised on the determination "that plaintiffs have stated a claim for relief under the mandamus statute."  *See* 219 F. Supp. 2d at 44.  The plaintiff's mandamus claims in the instant actions may be dismissed on this ground alone because the Court may treat the plaintiff's failure to oppose the defendant's 12(b)(6) arguments as a decision to concede those arguments.  *See Shankar v. ACS-GSI*, 258 F. App'x 344, 345 (D.C. Cir. 2007) (holding that plaintiff conceded the merits of an issue when he "did not respond in any way to defendant's argument" on that issue in his opposition before the district court (citing Local Civil Rule 7(b))); *Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) ("It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (citing *FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997))).

Even if the plaintiff had not conceded its failure to plead claims for relief under the Mandamus Act, however, the mandamus claims would still be appropriately dismissed because the plaintiff's FOIA claims would provide an adequate remedy for all of the policies or practices for which the plaintiff seeks relief under the Mandamus Act.  The FOIA itself is the source of what the plaintiff views as the CIA's clear duties to act and the plaintiff's clear rights to relief, which underlie the plaintiff's mandamus claims.  *See* FAC ¶¶ 22, 25, 37, 39, 67, 69, 83, *NSC II*; FAC ¶¶ 113, 115, *NSC III*.  Thus, to the extent a remedy would be available to the plaintiff under

---

[23] The CIA made it very clear in its motions to dismiss that it was seeking dismissal of the plaintiff's mandamus claims under both Rule 12(b)(1) and Rule 12(b)(6).  *See* Def.'s 444 Mem. at 5–6; Defs.' 445 Mem. at 5–6.

the Mandamus Act, an identical and adequate injunctive remedy would be available to the plaintiff under the FOIA.  *See Payne*, 837 F.2d at 494 ("The FOIA imposes no limits on courts' equitable powers in enforcing its terms."); *Muttitt*, 813 F. Supp. 2d at 228–29.  Likewise to the extent that a remedy is *unavailable* to the plaintiff under the FOIA for any particular policy or practice, a remedy would be equally unavailable under the Mandamus Act.  It necessarily follows that the plaintiff cannot plead any facts that would show that there is no other adequate remedy available, and therefore all of the plaintiff's remaining Mandamus Act claims—Counts Four, Seven, Thirteen, and Sixteen of No. 11-444—will be dismissed.

### C.  Remaining Policy-or-Practice Claims

With the universe of remaining policy-or-practice claims now narrowed to the nine causes of action alleged under the FOIA itself and the one cause of action under the APA,[24] the Court will now discuss whether the plaintiff has succeeded in pleading a claim for relief for any of those alleged policies or practices.  The CIA moves to dismiss each of these policy-or-practice claims for failure to state a claim under Rule 12(b)(6).  *See* Def.'s 444 Mem. at 12–20; Defs.' 445 Mem. at 10–19.

### 1.  *Aggregate Data Policy*

The plaintiff challenges the CIA's alleged Aggregate Data Policy (*i.e.*, refusing to process FOIA requests that seek "aggregate data") in Count Two of No. 11-444.  *See* FAC ¶¶ 12, 14, *NSC II*.  The requests for what the plaintiff terms "aggregate data" have sought database listings sorted by various criteria.  In particular, the plaintiff points to two examples of "aggregate data" requests that the CIA has refused to process:  (1) a request for "database listings of all FOIA requesters from Fiscal Years 2008–2010 according to the fee categories to which

---

[24] Once again, these ten policies or practices exclude Assignment of Rights Policy discussed above.  *See* discussion *supra* Part III.A.1.

CIA assigned them," and (2) a request for "a record that would indicate the ten individuals responsible for the most FOIA requests submitted (each) in Fiscal Years 2008, 2009, and 2010." *Id.* ¶¶ 6, 42.  The CIA refused to process these requests either on the grounds that its record systems were not configured in a way that would allow it to perform an adequate search without an unreasonable effort or on the grounds that the FOIA does not require federal agencies to create records, collect information, conduct research, analyze data, or conduct unreasonable searches.  *See* Lutz Decl. Exs. E–H, L.

The CIA argues that the plaintiff's challenge to the alleged Aggregate Data Policy should be dismissed for failure to state a claim because, assuming that such a policy exists, it would not violate the FOIA.  *See* Def.'s 444 Mem. at 13–14.  The CIA maintains that processing requests for database listings would (a) require it to create new records, as opposed to merely producing preexisting records and/or (b) require it to conduct research, as opposed to merely performing a search.  *Id.*; Reply in Supp. Def.'s Partial Mot. Dismiss Pl.'s First Am. Compl. ("Def.'s 444 Reply") at 14, *NSC II*, ECF No. 18.  The CIA further argues that, because the FOIA does not require agencies to create new records or conduct research, a policy of refusing to do so does not violate the FOIA.  Def.'s 444 Reply at 14.  The plaintiff responds, however, that the act of sorting a database by certain criteria (*e.g.*, fee category of requester) and providing a listing of that database so sorted does not constitute creating new records or conducting research—rather, it merely constitutes performing a search and producing the results of that search.  *See* Pl.'s 444 Opp'n at 21.

The CIA is correct, and the plaintiff appears to agree, that "the FOIA imposes no duty on the agency to create records."  *Forsham v. Harris*, 445 U.S. 169, 186 (1980) (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161–62 (1975)); *accord Yeager v. DEA*, 678 F.2d 315, 321

(D.C. Cir. 1982) ("It is well settled that an agency is not required by FOIA to create a document

that does not exist in order to satisfy a request.").  The FOIA also does not require agencies to

conduct research by "answer[ing] questions disguised as a FOIA request."  *Hudgins v. IRS*, 620

F. Supp. 19, 21 (D.D.C. 1985), *aff'd mem.*, 808 F.2d 137 (D.C. Cir. 1987); *see also Frank v. U.S.*

*Dep't of Justice*, 941 F. Supp. 4, 5 (1996) (holding that agencies are "not required, by FOIA or

by any other statute, to dig out all the information that might exist, in whatever form or place it

might be found, and to *create* a document that answers plaintiff's question").  The dispute with

respect to the alleged Aggregate Data Policy, however, is whether the plaintiff's FOIA requests

for "aggregate data" require the CIA to create new records or conduct research to answer

questions.

The 1996 Electronic FOIA Amendments ("E-FOIA Amendments") provide some useful

context in understanding what is required of agencies in running searches in an era when

"agencies increasingly use computers to conduct agency business and to store publicly valuable

agency records and information."  Pub. L. No. 104-231, § 2(a)(5), 110 Stat. 3048, 3048 (1996).

The E-FOIA Amendments were intended to "maximize the usefulness of agency records and

information collected, maintained, used, retained, and disseminated by the Federal Government."

*Id.* § 2(b)(4), 110 Stat. at 3049.  Congress provided in the Amendments that, "[g]overnment

agencies should use new technology to enhance public access to agency records and

information."  *Id.* § 2(a)(6), 110 Stat. at 3048.  Thus, the Amendments expanded the definition of

a "record" to include "any information that would be an agency record . . . when maintained by

an agency *in any format, including an electronic format*," *id.* § 3, 110 Stat. at 3049 (emphasis

added), and they expanded the definition of "search" to mean "to review, manually *or by*

*automated means*," *id.* § 5, 110 Stat. at 3050 (emphasis added).  The Amendments also added the

provision that, "[i]n responding . . . to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system." *Id.* In light of these changes to the FOIA regime, "[e]lectronic database searches are . . . not regarded as involving the creation of new records." *People for the Am. Way Found. v. U.S. Dep't of Justice*, 451 F. Supp. 2d 6, 14 (D.D.C. 2006) (internal quotation marks omitted); *see also* H.R. Rep. 104-795, at 22 (1996) ("Computer records found in a database rather than a file cabinet may require the application of codes or some form of programming to retrieve the information. . . . [T]he review of computerized records would not amount to the creation of records.").

In responding to a FOIA request for "aggregate data," therefore, an agency need not create a new database or a reorganize its method of archiving data, but if the agency already stores records in an electronic database, searching that database does not involve the creation of a new record. Likewise, sorting a pre-existing database of information to make information intelligible does not involve the creation of a new record because, as Congress noted in the legislative history to the E-FOIA Amendments, "[c]omputer records found in a database rather than a file cabinet may require the application of codes or some form of programming to retrieve the information." H.R. Rep. 104-795, at 22. Sorting a database by a particular data field (*e.g.*, date, category, title) is essentially "the application of codes or some form of programming," and thus does not involve creating new records or conducting research—it is just another form of searching that is within the scope of an agency's duties in responding to FOIA requests.

Nevertheless, the distinction between searching and either performing research or creating records remains somewhat muddled. In particular, there is a tension between the well-settled prohibition against requiring agencies to conduct research and create records, and the

policy of the E-FOIA Amendments to bring the contents of electronic databases within the FOIA's reach.  When points of data are stored in a database, that data can often be manipulated in myriad ways, only some of which are likely to qualify as mere "searching" within the meaning of the FOIA.  *See, e.g., Labella v. FBI*, No. 11-CV-0023, 2012 WL 948567 at *12 n.12 (E.D.N.Y. Mar. 19, 2012) (observing that "FOIA did not obligate the [defendant] to provide [the plaintiff] with 'aggregate data'" where the plaintiff sought "'aggregate data' related to the victim class and distinct subgroups of" the Supplemental Victimization Survey to the National Crime Victimization Survey).  Although the E-FOIA Amendments condone "the application of codes or some form of programming to retrieve the information" contained in an electronic database, neither the text of the statute nor the legislative history provides any guidance on when the manipulation of data points in an electronic database through "the application of codes or some form of programming" crosses the all-important line between searching a database, on the one hand, and either creating a record or conducting research in a database on the other.

With this tension in mind, although the act of searching or sorting an electronic database is clearly not the creation of a record under the FOIA, the question remains whether producing a *listing* of database search results involves the creation of a record.  First, it is important to note that it is not unprecedented for a federal agency to produce entire fields of data from particular electronic databases in response to a FOIA request, *see, e.g., Long v. U.S. Dep't of Justice*, 450 F. Supp. 2d 42, 48 (D.D.C. 2006) (DOJ produced several fields from "the EOUSA's central case management data under the FOIA"), and such requests could certainly be considered requests for "aggregate data."  Producing a listing or index of records, however, is different than producing particular points of data (*i.e.*, the records themselves).  This is because a particular listing or index of the contents of a database would not necessarily have existed prior to a given FOIA

request.  For example, a request seeking "a database listing of the first 100 FOIA requests filed

in Fiscal Year 2012," may require the creation of a new record because the record being

requested—whether produced in the format of a printout, a "screen shot," or something similar—

[25] is not necessarily something "that an agency has in fact chosen to create and retain."  *Yeager*,

678 F.2d at 321.  The same would be true of paper, rather than electronic, records.  For example,

if a FOIA request sought "an inventory of all non-electronic records created in 1962 regarding

the Cuban Missile Crisis," an agency need not create an inventory if one did not already exist,

though the agency would need to release any such non-electronic records themselves if they were

requested and were not exempt from disclosure.  Therefore, a FOIA request for a listing or index

of a database's contents that does not seek the contents of the database, but instead essentially

seeks information about those contents, is a request that requires the creation of a new record,

insofar as the agency has not previously created and retained such a listing or index.[26]  *See*

*People for the American Way*, 451 F. Supp. 2d at 15 (producing a "list of records returned from

[a database] search" is "something that FOIA does not mandate" because "the list was not

previously created or obtained by the agency" and "an order that defendant produce such a list

would be tantamount to requiring the defendant to *create* an agency record").

---

[25] These were the sort of records sought by the plaintiff in its requests for "aggregate data."  *See* Pl.'s 444 Opp'n Ex. A at 1 (seeking "a list, index, printout, or similar document"); *id.* Ex. B at 1, 4, 7, 10 (seeking "database listing[s]"); *id.* Ex. E at 53 (seeking "an index or comparable list").  The first two of these requests were incorporated by reference in the First Amended Complaint.  *See* FAC ¶¶ 6, 42, *NSC II*.

[26] Similarly, requests for aggregate data, even if they seek data itself rather than a database listing or index, may nevertheless require an agency to perform research in response to a FOIA request—something courts have long held agencies are also not required to do.  *See, e.g.*, *Hudgins*, 620 F. Supp. at 21.  Congress contemplated this possibility in the E-FOIA Amendments by stating that when an agency responds to a FOIA request, it "shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system."  Pub. L. No. 104-231, § 5, 110 Stat. at 3050.  Thus, if a FOIA request for "aggregate data" would require an unreasonably burdensome electronic search within the confines of an agency's automated information system, an agency need not conduct the search.  *See, e.g.*, *Wolf v. CIA*, 569 F. Supp. 2d 1, 8 (D.D.C. 2008) (agreeing that the CIA was not required to search its microfilm files "because such a search would be unduly burdensome and exceed the requirements of FOIA").

Even so, deciding whether or not the plaintiff has stated a claim for relief in its challenge to the CIA's alleged Aggregate Data Policy (Count Two of No. 11-444) is an exceedingly close call because the phrase used by the plaintiff in its First Amended Complaint—"aggregate data"—is ambiguous.  Whether or not the claim can survive depends upon whether, in light of the specific examples of "aggregate data" requests provided by the plaintiff in its First Amended Complaint (*i.e.*, Counts One and Eight), it would be reasonable to construe the plaintiff's allegations to include requests for aggregate data itself, as opposed to including only requests for "database listings" or "printouts" of such listings.  The plaintiff seems to contend that a request for a "database listing" or "printout" of such a listing is a proper FOIA request on its face, *see* Pl.'s 444 Opp'n at 20–21, which is incorrect, as the Court's discussion above makes clear.  One of the two specific FOIA requests that the plaintiff alleges as an example of an "aggregate data" request, however, sought, in the alternative, the underlying records themselves, *see id.* Ex. A at 2 (seeking, in the alternative, "[a]ll FOIA request letters submitted to the CIA for each year"), which would not require the creation of a record. [27]  Even so, this single request is insufficient to allege the existence of a policy or practice of the CIA refusing to produce the contents of an electronic database because it could just as easily have been an isolated incident.  *See Iqbal*, 556 U.S. at 678 (complaint must plead facts that are more than "'merely consistent with' a defendant's liability").  Therefore, the plaintiff has failed to state claim for relief challenging the CIA's alleged Aggregate Data Policy, and Count Two in No. 11-444 will be dismissed.

The Court pauses, however, to note the perverse practical consequences of the CIA's choice to refuse to provide database listings in response to FOIA requests.  The FOIA requires agencies to disclose all non-exempt data points that it retains in electronic databases, *see, e.g.*,

---

[27] The FOIA request that contains this alternative request is incorporated by reference in the First Amended Complaint.  *See* FAC ¶ 42, *NSC II*.

*Long*, 450 F. Supp. 2d at 48, and thus although the CIA may not be required to produce an index

or database listing in response to a FOIA request, it *can* be required to hand over the contents of

entire databases of information to the extent those contents are not exempt from disclosure.[28]

Although producing the contents of a database would likely involve the same search burden upon

an agency as producing a database listing, the production of a database listing would entail a

substantially lighter *production* burden upon the agency.   Despite the fact that the CIA can

continue to escape the production of database listings under the FOIA if it wishes, the CIA may

nevertheless find it more efficient to begin producing such database listings upon request

because failing to do so may prompt requesters to seek the reams of data underlying such listings

instead.[29]

## 2. *Reasonably Describe Policy*

The plaintiff challenges the CIA's alleged Resonably Describe policy  in Count Eleven of

No. 11-444, claiming that the CIA regularly refuses to process FOIA requests that the CIA

deems not to "reasonably describe" the records sought.   *See* FAC ¶¶ 56–61, *NSC II*.   The

plaintiff claims that this behavior constitutes a policy or practice of applying a definition of the

FOIA's "reasonably describes" requirement that "is significantly and consistently broader than is

allowed by FOIA."   FAC ¶ 58, *NSC II*.   In the same vein, the plaintiff alleges that "[i]n a

majority of these cases, CIA has cited the configuration of its records systems as a disqualifying

factor."   *Id.*   Ultimately, the plaintiff takes issue with two aspects of the CIA's interpretation of

---

[28] In fact, the Executive Office for the U.S. Attorneys "regularly releases national caseload statistical data in response to monthly requests under the Freedom of Information and Privacy Acts."   The United States Attorneys Office—FOIA/PA Reading Room, http://www.justice.gov/usao/reading_room/data/CaseStats.htm (last visited Oct. 17, 2012).  The CIA could potentially be subject to similar monthly reporting of its database of FOIA request information.

[29] It also may prompt Congress to supplement current annual FOIA reporting requirements to include aggregate data, such as the total number of FOIA requesters organized by fee category or the ten most prolific FOIA requesters to an agency in a given fiscal year.  *See* 5 U.S.C. § 552(e)(1).

the FOIA's "reasonably describes" requirement.  First, the plaintiff claims that the CIA has

inappropriately restricted the term "reasonably describe" by requiring requests to be couched "in

terms of the request's compatibility with existing indexing systems."  Pl.'s 444 Opp'n at 23.

Second, the plaintiff claims that the defendant has adopted an overbroad interpretation of terms

like "relating to" and "pertaining to" in concluding that those terms render descriptions

unreasonably vague.  *See* Pl.'s Opp'n to Def.'s Mot. Summ. J. ("Pl.'s 444 Summ. J. Opp'n") at

19, *NSC II*, ECF No. 26. [30]

Beginning with the first aspect, the CIA argues that the plaintiff's challenge to the

Reasonably Describe Policy should be dismissed for failure to state a claim because determining

whether a request reasonably describes the records sought "depends both on the nature of the

request and the type of records system an agency has."  Def.'s 444 Mem. at 16.  In support of

this argument, the CIA cites its own FOIA regulation, which states:

> A request need only reasonably describe the records of interest.  This means that
> documents must be described sufficiently to enable a professional employee
> familiar with the subject to locate the documents with a reasonable effort.
> Commonly this equates to a requirement that the documents must be *locatable*
> *through the indexing of our various systems.*

32 C.F.R. § 1900.12 (emphasis added).  The CIA's FOIA regulations also define reasonably

described records to mean "a description of a document (record) by unique identification number

or descriptive terms which permit an Agency employee to locate documents with reasonable

effort *given existing indices and finding aids*."  *Id.* § 1900.02(m) (emphasis added).  In response,

however, the plaintiff likewise cites these regulations, but it argues that their language

"restricting th[e] definition [of 'reasonably describes'] in terms of the request's compatibility

---

[30] Indeed, the plaintiff goes so far as to argue in its opposition to the CIA's motion for summary judgment in No. 11-444 that it "feels comfortable in saying" that the defendant's overbroad interpretation of terms like "relating to" and "pertaining to" is "likely the worst component of the 'overbroad application of "reasonably describe"' pattern or practice it seeks to overturn in Count 11," Pl.'s 444 Summ. J. Opp'n at 19, even though the plaintiff failed to reference this argument at all in its opposition to the CIA's motion to dismiss.  The Court will address this argument anyway, in the interest of providing a comprehensive analysis of the plaintiff's challenge.

with existing index systems is an impermissible interpretation of Congress's intent and therefore must be rejected." Pl.'s 444 Opp'n at 23.

Whether or not the CIA's interpretation of the term "reasonably describes" in the FOIA is inconsistent with the FOIA is a purely legal question of statutory interpretation that the Court will review *de novo*. *See United States v. Cook*, 594 F.3d 883, 886 (D.C. Cir. 2010) (holding that "the proper interpretation of a statute is a question of law"); *Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1253 (D.C. Cir. 2003) ("For generic statutes like the APA, FOIA, and [Federal Advisory Committee Act], the broadly sprawling applicability undermines any basis for deference, and courts must therefore review interpretive questions de novo."); *Tax Analysts v. IRS*, 117 F.3d 607, 613 (D.C. Cir. 1997) ("The meaning of FOIA should be the same no matter which agency is asked to produce its records.") Therefore, "because a court can fully resolve any purely legal questions on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

Under the FOIA, agencies are required to make "promptly available" records that are "reasonably describe[d]" in a request that "is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, and which are not exempt from disclosure." 5 U.S.C. §§ 552(a)(3)(A), 552(b).[31] The phrase "requests for records which . . . reasonably describes such records" was added to the FOIA in 1974, and it replaced the phrase "request for identifiable records." *See* Pub. L. No. 93-502, § 1(b)(1), 88 Stat. 1561, 1561 (1974).

---

[31] Thus, the question of whether or not a request "reasonably describes" the requested records is a threshold administrative inquiry.  An agency need not make records available to a requester unless and until a requester "reasonably describes such records."  Hence, there is a meaningful difference between a broadly sweeping yet "reasonably describe[d]" FOIA request, which might trigger the agency's duties to communicate and cooperate with requesters under 5 U.S.C. § 552(a)(6)(B)(ii), and a request that fails to meet the threshold of "reasonably describ[ing]" the records in the first place.

The Senate Judiciary Committee Report accompanying this amendment stated that, "the identification standard in the FOIA should not be used to obstruct public access to agency records" and the amendment "makes explicit the liberal standard for identification that Congress intended." S. Rep. No. 93-854, at 10 (1974). The House Committee on Government Operations Report accompanying the amendment clarified that, "a 'description' of a requested document would be sufficient if it enabled a professional employee of the agency who was familiar with the subject area of the request to locate the record with a reasonable amount of effort." H.R. Rep. No. 93-876, at 5–6. The D.C. Circuit has held, in this regard, that "[t]he linchpin inquiry" in determining whether a request "reasonably describes" the records sought is "whether the agency is able to determine 'precisely what records [are] being requested.'" *Yeager*, 678 F.2d at 326 (alteration in original) (quoting S. Rep. No. 93-854, at 10).

The CIA argues that, "[b]ecause the way [its] records system is configured directly affects whether a CIA professional employee can locate requested documents with a reasonable amount of effort, the configuration of its records system is a proper factor for [it] to consider in determining whether a FOIA communication adequately describes the requested records." Def.'s 444 Mem. at 16–17. In support of this argument, the CIA cites two cases from this Court that discussed an agency's ability to consider the configuration of its own records system in responding to FOIA requests. *Id.* at 16; *see Assassination Archives & Research Ctr., Inc. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989) ("[A]gencies are not required to maintain their records or perform searches which are not compatible with their own document retrieval systems."); *Blakely v. Dep't of Justice*, 549 F. Supp. 362, 366–67 (D.D.C. 1982) ("The FOIA was not intended to compel agencies to become ad hoc investigators for requesters whose requests are not compatible with their own information retrieval systems."). In response, the plaintiff relies

heavily on the legislative history of the 1974 FOIA amendments, most of which is cited and discussed above.  *See* Pl.'s 444 Opp'n at 23–24.  As the defendant correctly points out, however, the legislative history does not "directly mention whether an agency can consider the configuration of its records in determining whether a FOIA request reasonably describes the records sought."  Def.'s 444 Reply at 16.

Reading between the lines of the plaintiff's brief, it appears that the plaintiff essentially concedes that an agency is allowed to *consider* the configuration of its records systems in responding to a FOIA request.  In fact, the plaintiff's brief cites no authority that would contradict that principle.  The plaintiff's argument is focused more on the principle that an agency cannot disingenuously hide behind the configuration of its records systems in an attempt to thwart otherwise proper FOIA requests.  *See, e.g.*, Pl.'s 444 Opp'n at 24 (arguing that the 1974 FOIA amendment, adding the term "reasonably describes," was "supposed to 'directly aid citizens in obtaining Government documents'").  Without addressing the merits of this latter principle, the Court simply notes that such a principle is irrelevant to deciding the first question presented by the plaintiff's policy or practice claim, *i.e.*, whether the FOIA permits agencies to consider the configuration of their records systems in deciding whether a FOIA request "reasonably describes" the records sought.

On that question, the defendant clearly has the better of the argument.  It has been the law in this Circuit for nearly 35 years that:

> [A]n agency is not required to reorganize its files in response to a plaintiff's request in the form in which it was made, and that if an agency has not previously segregated the requested class of records production may be required only where the agency can identify that material with reasonable effort.

*Goland v. CIA*, 607 F.2d 339, 353 (D.C. Cir. 1978) (alterations, footnotes, and internal quotation marks omitted).  This principle is perfectly consistent with the legislative history cited by the

plaintiff, which states that a request reasonably describes records sought when it would enable an informed agency employee to locate the records "with a reasonable amount of effort."  H.R. Rep. No. 93-876, at 6.  The legislative history did not sweep as broadly as the plaintiff suggests because the legislative history indicates that Congress was more narrowly concerned that agencies were requiring requesters to cite "a specific title or file number" in their requests, *see id.* at 5; *see also* 120 Cong. Rec. 6,809 (1974) (statement of Rep. Thorne), not that agencies were taking the configuration of their records systems into account more generally.  It would be unreasonable to require agencies to throw practical considerations to the wind in deciding whether they can process FOIA requests because, although the FOIA regime undoubtedly seeks to "directly aid citizens in obtaining Government documents," it also strives to achieve that goal without trampling on the agency's prerogative to organize and manage its records in a reasonably efficient manner.  In other words, an agency is presumably unable "to determine 'precisely what records [are] being requested'" when it cannot perform a reasonable search for the requested records within the limitations of how its records systems are configured.  *See Yeager*, 678 F.2d at 326.

The search at issue in *Goland* is a useful example.  In that case, the plaintiff sought documents related to the legislative history and passage of the National Security Act of 1974 and the CIA Act of 1949, as well as two bills introduced into Congress in 1948 providing for the administration of the CIA.  *Goland*, 607 F.2d at 342–43.  In particular, the plaintiff sought any documents produced from congressional reports or hearings related to these laws and also "any materials which may have been the basis for testimony at hearings or materials used by or submitted by the CIA or other Executive Branch sources which are included in unpublished reports on the cited bills."  *Id.* at 343 (alteration and internal quotation marks omitted).  The CIA

conducted a search for such records, but it averred in affidavits that it had "no indices or compendiums identifying records as 'preparatory documents for congressional testimony,'" and thus "any additional records of this description, if they exist, could be found only by 'a page-by-page search' through the '84,000 cubic feet of documents in the CIA Records Center.'"  *Id.* at 353 (alteration omitted).  The D.C. Circuit upheld the adequacy of this search, holding that the CIA's affidavits "plainly show[ed] that the effort required to locate the hypothesized 'back-up' documents [prepared for use at these hearings] would be unreasonable here."  *Id.* at 353–54.  Thus, *Goland* recognized the fact that the "reasonable efforts" that an agency is required to put forth in locating requested documents is bounded, at least in part, by the configuration of an agency's records systems.  It stands to reason that this principle applies to all stages of the processing of a FOIA request, including the threshold decision of whether to process the request at all.[32]

The plaintiff is still correct in asserting that an agency may not hide behind the limitations of its own records systems in refusing to process FOIA requests, but this the plaintiff has not alleged in its First Amended Complaint.  The plaintiff's policy-or-practice claim challenging the alleged Reasonably Describe Policy (Count Eleven in No. 11-444) only alleges

---

[32] The Court recognizes the hydraulic effect that this logical extension of *Goland* and its progeny could potentially have upon FOIA litigation:  If agencies are permitted to cite the configuration of their records systems in refusing to process a request as not "reasonably described," or as requiring an unduly burdensome search, requesters would be pushed to seek judicial review of agencies' FOIA responses at an earlier stage in the FOIA process.  This is only problematic to the extent that agencies choose to abuse this power by hiding behind the configuration of their records systems in refusing to process otherwise properly framed requests.  Agencies that see this doctrinal extension as an invitation to artfully dodge FOIA requests they would rather not process would be short-sighted, however, since such a choice would entail perverse consequences.  If an agency chooses to rely too heavily on the "reasonably describes" requirement to get rid of broad or pesky FOIA requests at their inception, rather than embracing the spirit of the agency's obligations under 5 U.S.C. § 552(a)(6)(B) to "provide the person an opportunity to limit the scope of the request" or "an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request," that agency will subject its FOIA processing practices to judicial scrutiny and supervision at a much earlier point in time than would otherwise be necessary.  The Court presumes that agencies will generally choose the path outlined in § 552(a)(6)(B)—which is triggered with a proper request— and responsibly exercise their discretion in deciding when to refuse to process FOIA requests because of the configuration of their records systems.

that the CIA's citation to the configuration of its records system is, as a general matter, an inappropriate basis to conclude that a requester has failed to reasonably describe the records sought. *See* FAC ¶¶ 57–61, *NSC II*. That claim under *Golan* must be dismissed because its legal premise is incorrect as a matter of law.

The second aspect of the plaintiff's challenge to the CIA's alleged Reasonably Describe Policy is also unavailing, but for a different reason. The plaintiff argues that the CIA interprets too broadly terms like "relating to" and "pertaining to" in FOIA requests, and the CIA allegedly relies on those overbroad interpretations to conclude that FOIA requests do not reasonably describe the records sought. *See* Pl.'s 444 Summ. J. Opp'n at 19 (arguing that the CIA has a "misguided rule that any request that contains the words 'pertaining to,' 'related to,' or 'relating to' is automatically overbroad whenever [the CIA] does not feel like processing it"). The problem with this aspect of the plaintiff's challenge is that, unlike the first aspect, it does not focus on a formal interpretation of the "reasonably describes" requirement. Rather, the plaintiff is arguing that the CIA has implemented a loose practice of concluding that many, perhaps most,[33] requests that use the phrases "relating to," "pertaining to," and the like do not reasonably describe the records sought. This fails to state claim in the abstract because, short of a categorical refusal to process any requests that contain these phrases, an agency is permitted to assess the language of each FOIA request that it receives in order to determine whether it "reasonably describes" the records it seeks.

---

[33] Although the plaintiff intimates that the CIA *categorically* refuses to process FOIA requests that contain the phrases "relating to" or "pertaining to," that insinuation is refuted by the plaintiff's First Amended Complaint, which includes a claim that the CIA processed, but found no records responsive to, a FOIA request for "all records pertaining to guidelines for attorneys in the Office of General Counsel ("OGC") for the conduct of civil cases, especially pertaining to interactions between OGC attorneys and Department of Justice ("DOJ") attorneys." FAC ¶¶ 105, 107, *NSC II*.

The Court nevertheless finds troubling the plaintiff's claim that the CIA is systematically attempting to overuse the "reasonably describes" requirement because such an abuse of the FOIA's statutory language would result in a large swath of FOIA requests never even getting processed, even though they should be. [34]  This is particularly disturbing in light of Congress's explicit admonition that agencies are not to use the "reasonably describes" requirement "to obstruct public access to agency records."  S. Rep. No. 93-854, at 10.  Federal courts' jurisdiction under the FOIA is not limited to denials of requests that reasonably describe the records sought, and an agency is not the final arbiter of whether a FOIA request "reasonably describes" the records it seeks.  Thus, a FOIA requester dissatisfied with an agency's decision about whether a request "reasonably describes" the records it seeks may seek judicial review of that question.  *See* discussion *infra* Part III.C.3.a.  Indeed, the CIA implicitly concedes this aspect of the Court's jurisdiction because it has not moved to dismiss the two claims by the plaintiff that the CIA has improperly refused to process particular FOIA requests deemed not to reasonably describe the records sought.  *See* FAC ¶¶ 46–55, *NSC II*.  Even so, the question of whether a particular FOIA request "reasonably describes" the records sought is a highly context-specific inquiry, ill-suited to abstract analysis without a formal (or at least officially acknowledged) agency interpretation of the "reasonably describes" requirement.  Lacking such an official agency interpretation with respect to the second aspect of its challenge to the CIA's alleged Reasonably Describe Policy, the plaintiff and requesters like it are limited to challenging individual refusals to process FOIA requests on the basis that the request does not reasonably describe the records sought.

---

[34] The plaintiff directs the Court to "nineteen of Defendant's most egregiously questionable determinations that requests allegedly failed to reasonably describe the records sought."  Pl.'s 444 Opp'n at 26.  Although the Court does not consider this evidence in ruling upon the CIA's motion to dismiss, it is worth observing that some of these examples include rather specific requests, such as a request for "a copy of all publications/reports made by the [Director of National Intelligence] Open Source Center for January of 2009."  *See* Pl.'s 444 Opp'n Ex. E at 37.

### 3.     *Administrative Appeals Policy and Work With Policy*

Under the FOIA, once an agency has received a request, it has twenty days within which to determine "whether to comply with such request," and the agency must also "immediately notify the person making such request of such determination" and "of the right of such person to appeal to the head of the agency any adverse determination."  5 U.S.C. § 552(a)(6)(A)(i).  The FOIA does not explicitly define the term "adverse determination."  Additionally, under the CIA's FOIA regulations, any communications "which do not meet the[] requirements [of reasonably describing the records sought and not requiring an unreasonable search] will be considered an expression of interest and the Agency will work with, and offer suggestions to, the potential requester in order to define a request properly."  32 C.F.R. § 1900.12(c).

The plaintiff challenges the CIA's alleged Administrative Appeals Policy in Count Five of No. 11-444 by alleging that when the CIA refuses to process a request that it deems improper, the CIA has a policy or practice of refusing the requester's right to administratively appeal that decision.  FAC ¶¶ 28–29, *NSC II*.  The plaintiff claims that "[a]n agency's duty to adjudicate administrative appeals of any negative determinations is a cornerstone of FOIA's due process framework," and therefore it avers that this alleged policy or practice violates the FOIA.  *Id.* ¶¶ 27, 29.  The CIA argues that this claim should be dismissed because an agency's determination that a FOIA request is improper or invalid does not qualify as an "adverse determination" that would trigger the right to administrative appeal under the statute, and therefore its policy of refusing the right of administrative appeal when a request is deemed improper or invalid is consistent with the FOIA.  *See* Def.'s 444 Mem. at 14–15.  Yet, the plaintiff responds that if the FOIA allows agencies to refuse the right to an administrative appeal, "the exhaustion doctrine is effectively turned on its head" leaving requesters "forced to speculate about [the agency's] reasons for its actions in a vacuum."  *See* Pl.'s 444 Opp'n at 22.

To better understand the context of the plaintiff's position, however, it is helpful also to consider a related policy or practice alleged by the plaintiff.  The plaintiff also challenges the CIA's alleged Work With Policy in Count Fifteen of No. 11-444, claiming that when the CIA deems a FOIA request improper or invalid, it habitually fails to contact the requester and "work with, and offer suggestions to, the potential requester in order to define a request properly," as required by the CIA's own regulations.  *See* FAC ¶ 74, *NSC II*.  The CIA argues that this claim should also be dismissed because the plaintiff has failed to "establish that the CIA has a policy or practice of not working with potential FOIA requesters," citing two of the examples of improper requests in the plaintiff's Complaint, which include suggestions from the CIA about how to refine the scope of the requests.  *See* Def.'s 444 Mem. at 18–19.

Combining these two alleged policies or practices, the plaintiff is claiming that the CIA has all but nullified agency consideration of requests that are deemed improper or invalid:  The alleged Work With Policy prevents requesters from refining improper requests to make them amenable to processing, and the alleged Administrative Appeals Policy leaves requesters with no avenue for administrative review of whether the determination was appropriate.  The question is whether the FOIA and the APA permit this state of affairs.  Though these two alleged policies are related, the legal analysis applied to these alleged policies will differ because the Administrative Appeals Policy is an alleged violation of the FOIA itself, while the Work With Policy is an alleged violation of the CIA's regulation.  Thus, the Administrative Appeals Policy will be evaluated under the FOIA, while the Work With Policy will be evaluated under the APA.

a)  *The Alleged Administrative Appeals Policy Fails to State a Claim under the FOIA*

As to the Administrative Appeals Policy, the plaintiff's claim can only survive if the FOIA requires agencies to provide an administrative appeal from a determination that a request

is improper.  In other words, it can survive only if a determination that a request is improper

qualifies as an "adverse determination" under the FOIA.  Once again, this raises a question of

statutory interpretation.

Many courts have recognized that an agency's disclosure duties under the FOIA are not

triggered until a proper FOIA request is submitted.  *See, e.g.*, *Truitt v. Dep't of State*, 897 F.2d

540, 544 (D.C. Cir. 1990) ("To be sure, a request which fails to 'reasonably describe[]' the

documents sought does not trigger a search for agency records."); *Davis v. FBI*, 767 F. Supp. 2d

201, 204 (D.D.C. 2011) ("An agency's disclosure obligations under the FOIA are triggered by its

receipt of a request that 'reasonably describes [the requested] records' and 'is made in

accordance with published rules stating the time, place, fees (if any), and procedures to be

followed.'"); *Ramstack v. Dep't of Army*, 607 F. Supp. 2d 94, 102 (D.D.C. 2009) ("[O]nly a

valid FOIA request can trigger an agency's FOIA obligations . . . .").  The D.C. Circuit also held,

in a seminal FOIA case, that "[a] response [by an agency] is sufficient for purposes of requiring

an administrative appeal if it includes: the agency's determination of whether or not to comply

with the request; the reasons for its decision; and notice of the right of the requester to appeal to

the head of the agency if the initial agency decision is adverse."  *Oglesby v. U.S. Dep't of Army*,

920 F.2d 57, 65 (D.C. Cir. 1990).

This case presents the question of whether a particular agency response is a

"determination" that would require the agency to provide for administrative exhaustion in the

form of an administrative appeal.  The cases in this Circuit, including *Oglesby*, however, have

only addressed the inverse question, *i.e.*, whether an agency response was a "determination" that

required *the requester* to exhaust its administrative remedies.  Thus, the Circuit's definition of a

response that "is sufficient for purposes of requiring an administrative appeal," articulated in

*Oglesby*, sheds no light on the question presented in this case because it defines such a response, in part, by whether the agency has provided "notice of the right of the requester to appeal to the head of the agency." *Id.*; *see also Hall & Assocs. v. EPA*, 846 F. Supp. 2d 231, 240 (D.D.C. 2012) (holding that agency response was not "adverse determination" where the agency response did not notify the requester of its right to administrative appeal). For purposes of the question presented in the instant case (whether an agency must provide an administrative appeal), the definition of an adverse determination outlined in *Oglesby* (a determination that includes the right of administrative appeal) is merely circular. In other words, *Oglesby* and the instant case reside on opposite sides of the same coin—*Oglesby* deals with when a requester must *pursue* an administrative appeal, and the instant case deals with when an agency must *provide* an administrative appeal.

The language and structure of the FOIA nevertheless provide a reasonably clear answer to the question raised by the plaintiff's challenge to the CIA's Administrative Appeals Policy. The FOIA states that, "upon any [proper] request," *i.e.*, a request "made under paragraph (1), (2), or (3) of this subsection,"[35] the agency "shall . . . determine within 20 days . . . *after the receipt of any such request* whether to comply with such request." 5 U.S.C. § 552(a)(6)(A) (emphasis added). This language makes clear that an agency has no duty to make any "determination" with regard to a FOIA request unless that request is proper. Thus, it is reasonable to conclude that the term "adverse determination" in 5 U.S.C. § 552(a)(6)(A)(i) only contemplates agency decisions that are in response to a proper FOIA request. In other words, the FOIA does not require agencies to provide administrative appeals on the issue of whether a request is proper in the first

---

[35] The relevant paragraph for FOIA requests is paragraph (3), which is the paragraph that requires requests to "reasonably describe[]" the records sought. *See* 5 U.S.C. § 552(a)(3). The instant cases do not implicate requests made under 5 U.S.C. § 552(a)(1) or § 552(a)(2).

place.  Therefore, the plaintiff's challenge to the CIA's alleged Administrative Appeals Policy

(Count Five in No. 11-444) will be dismissed for failure to state a claim.

Again, however, this result may entail perverse consequences for the CIA.  As discussed

above, the unavailability of an administrative appeal would not preclude a requester from

seeking *judicial* review of an agency's decision that a request is improper, and the CIA does not

contend otherwise.  *See* discussion *supra* Part III.C.2.  At the very least, such an agency decision

would be presumptively reviewable under the APA, if not the FOIA itself.  *See, e.g.*, *Council for*

*Urological Interests v. Sebelius*, 668 F.3d 704, 708–09 (D.C. Cir. 2011) (recognizing the "strong

presumption that Congress intends judicial review of administrative action'" (quoting *Bowen v.*

*Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986))).  In such a circumstance, a

requester's failure to exhaust its administrative remedies does not bar judicial review because,

when an agency makes a conscious choice not to provide a party with administrative process, the

agency constructively waives the requirement of administrative exhaustion.  *See Cutler v. Hayes*,

818 F.2d 879, 891 (D.C. Cir. 1987) (holding that "the exhaustion requirement may be waived by

the agency, or disregarded by the court when application of the doctrine would be futile");

*accord Harline v. DEA*, 148 F.3d 1199, 1202 (10th Cir. 1998) ("Exhaustion is waivable by an

agency, as when the agency itself acknowledges further administrative proceedings would not

serve its purposes." (citing *Weinberger v. Salfi*, 422 U.S. 749, 764–67 (1975) and *Bowen v. City*

*of New York*, 476 U.S. 467, 484 (1986))).  A party appearing before an administrative body

cannot be punished for the agency's choice to shoot itself in the foot by refusing to review its

own decisions.  In this way, the refusal of the CIA to provide administrative appeals in these

circumstances could be viewed as a boon to FOIA requesters because it expedites a requester's

ability to seek judicial review of an agency's decisions that a particular request does not

reasonably describe records sought or otherwise fails to comply with the agency's FOIA regulations.

To the extent the CIA's failure to provide administrative appeals to requesters regarding whether a request "reasonably describes" records is an attempt to divert FOIA cases from the agency's docket to the dockets of the federal courts, however, the CIA may try the patience of judges called upon to adjudicate these claims because they consume scarce judicial resources on questions that could easily, and perhaps more appropriately, be addressed at the administrative level.  The Court also recognizes that the effect on the plaintiff and other FOIA requesters (not to mention taxpayers) from the agency's diversion of these claims to the courts is an expensive one, forcing requesters and the government alike to expend time and money litigating these claims. In sum, although the FOIA permits the CIA to continue this alleged policy, the CIA should carefully consider the prudence of doing so.

  b) *The Alleged Work With Policy Fails to State a Claim Under the APA*

The plaintiff's related claim regarding the CIA's alleged Work With Policy fails to state a claim under the APA.  The CIA does not contest that it has a clear duty to "work with, and offer suggestions to" potential requesters who have submitted improper requests "in order to define a request properly."  *See* 32 C.F.R. § 1900.12(c).  Thus, the CIA also does not appear to contest that a policy, in the form of a "final agency action," which refuses to "work with, and offer suggestions to" potential requesters would violate its own regulation and could be set aside under the APA as agency action that is "without observance of procedure required by law."  *See* 5 U.S.C. § 706(2)(D).  The CIA's only argument in favor of dismissal is that the plaintiff "cannot establish that the CIA has a policy or practice of not working with potential FOIA requesters," pointing to "examples of the CIA working with and offering suggestions to" the plaintiff, which

are contained in the plaintiff's First Amended Complaint.  Def.'s 444 Mem. at 18–19; *see also*

Def.'s 444 Reply at 17.  As it relates to the APA claim challenging the CIA's alleged Work With

Policy (Count Fifteen in No. 11-444), the Court construes the defendant's argument to be that the

plaintiff has failed to allege a "final agency action," which is required to state a claim under the

APA.  *See* 5 U.S.C. § 704; *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 946

(D.C. Cir. 2012).

The D.C. Circuit has made clear that "an on-going program or policy is not, in itself, a

'final agency action' under the APA," and thus a court's "jurisdiction does not extend to

reviewing generalized complaints about agency behavior."  *Cobell v. Kempthorne*, 455 F.3d 301,

307 (D.C. Cir. 2006) (internal quotation marks omitted).  A plaintiff "cannot seek *wholesale*

improvement" of the CIA's patterns of behavior in responding to FOIA requests under the APA

"rather than in the offices of the [agency] or the halls of Congress, where programmatic

improvements are normally made."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  In

other words, the plaintiff complains of "the continuing (and thus constantly changing) operations

of the [CIA] in reviewing [FOIA requests]," which is "no more an identifiable 'agency action'—

much less a 'final agency action'—than a 'weapons procurement program' of the Department of

Defense or a 'drug interdiction program' of the Drug Enforcement Administration."  *Id.* at 890.

The plaintiff does not claim that the alleged Work With Policy is pursuant to any

officially acknowledged agency rule or policy in place at the CIA.  Nor does the plaintiff allege

that this "policy, practice, or standard operating procedure" of the CIA is mandatory upon

agency officials.  The plaintiff merely observes that the CIA has consistently refused to "work

with" FOIA requesters on a number of occasions.  This sort of "generalized complaint[] about

agency behavior," however, is not a complaint about final agency action.  *See Cobell*, 455 F.3d

at 307.  As was the case with the plaintiff's challenge to the alleged Reasonably Describe Policy, individual refusals by the CIA to "work with" requesters may be subject to challenge within the framework of the APA, *see, e.g.*, *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]gency decisions in informal adjudication are subject to judicial review under § 706 of the APA."), but at a broader policy level, the plaintiff has failed to allege a "final agency action," and thus the plaintiff's APA challenge to the CIA's alleged Work With Policy (Count Fifteen in No. 11-444) will be dismissed for failure to state a claim.[36]

### 4.  *Cut-Off Date Policy*

The Court next addresses the plaintiff's challenge to the CIA's alleged Cut-Off Date Policy.  The plaintiff claims that, pursuant to this alleged policy, the CIA "applies an arbitrary 'date of response' cut-off date" on FOIA requests "regardless of the nature of the request or the anticipated length of the search."  FAC ¶ 113, *NSC II*.  An agency rule establishing a temporal limit to its search efforts under the FOIA "is only valid when the limitation is consistent with the agency's duty to take *reasonable* steps to ferret out requested documents."  *McGehee v. CIA*, 697 F.2d 1095, 1101 (D.C. Cir. 1983).  The D.C. Circuit disfavors an agency's "reflexive application of [a] cut-off policy to every request regardless of circumstances" and has "expressly rejected the proposition that under FOIA, the 'use of a time-of-request cut-off date is always reasonable.'" *Public Citizen v. Dep't of State*, 276 F.3d 634, 643 (D.C. Cir. 2002) (quoting *McGehee*, 697 F.2d at 1102).  Nevertheless, "specific circumstances in some agencies may render an across-the-

---

[36] Although the plaintiff fails to state a claim for relief in this Court, the plaintiff's complaint about the Work With policy is best directed at Congress.  The CIA's duty to "work with" requesters, like an agency's determination of whether a request "reasonably describes" the records sought, occurs at the threshold of the FOIA request process. The FOIA itself imposes a similar duty to "provide [a requester] an opportunity to limit the scope of [its] request . . . or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request."  5 U.S.C. § 552(a)(6)(B)(ii).  This latter duty, however, is not triggered if an agency has not yet received a request that "reasonably describes such records."  Hence, there is a statutory disconnect between § 552(a)(3) and § 552(a)(6)(B), which leaves the plaintiff unable to challenge the CIA's alleged policy or practice under either the FOIA or the APA.

board rule reasonable," and it is the agency's burden to make a "showing that warrants such an approach." *See id.*

In the instant actions, the CIA argues that its alleged Cut-Off Date Policy would be reasonable "because the CIA is a large agency that receives a substantial volume of FOIA requests." Def.'s 444 Reply at 18.  This argument is unpersuasive for two reasons.  First, determining the reasonableness of an agency's categorical cut-off date for running FOIA searches is particularly inappropriate at the motion to dismiss stage because the CIA has not yet submitted any affidavits or other proof that would support its argument that an across-the-board cut-off date is reasonable.  *See Public Citizen*, 276 F.3d at 643–44 (to establish reasonableness of across-the-board cut-off date, an agency must make a "showing that warrants such an approach" that would "substantiate its claim").  Second, the agency's reasoning has largely been rejected by the D.C. Circuit in *McGehee* and *Public Citizen*.  In fact, *McGehee* specifically addressed the CIA's policy of imposing a categorical date-of-request (rather than date-of-response) cut-off date.  In that case, the CIA put forth a number of justifications similar to the one proffered in the instant action, all of which the D.C. Circuit rejected as a basis for concluding that an across-the-board policy was reasonable.  Specifically, the CIA pointed to

> the benefits of 'precis[ion]' (the value of having a single cut-off date that all agency divisions know in advance), the 'confusion' that might be engendered by different agency components using different cut-off dates (*e.g.*, each division using the date at which it commenced searching for its documents), the alleged costs and inconvenience to the agency of conducting the successive, duplicative searches that might be necessary if the date of a final response or the date of litigation were employed as a cut-off date, and the disruption of the agency's fee schedules that would accompany the use of anything other than its present procedure.

*McGehee*, 697 F.2d at 1103–04.  The CIA similarly now claims that its policy is reasonable because, as "a large agency" that "processes a high volume of FOIA requests," it requires the "consistency and uniformity" that result from a categorical cut-off date.  Def.'s 444 Mem. at 20.

It would be out of line with the precedents in this Circuit for the Court to conclude as a matter of law that the CIA's policy is reasonable. *See Public Citizen*, 276 F.3d at 644 ("At the very least, we think that with minimal administrative hassle, the [agency] could apply a date-of-*search* cut-off . . . ."). Thus, the CIA's motion to dismiss will be denied with respect to the plaintiff's challenge to the CIA's alleged Cut-Off Date Policy (Count Twenty-One of No. 11-444), and the CIA will have an opportunity to "adduce additional relevant testimony" that its policy is reasonable. *See McGehee*, 697 F.2d at 1104.

**5.      *Withheld Document Non-Identification Policy and Document-Level Exemption Policy***

Next, the Court addresses the plaintiff's challenge to the CIA's alleged Withheld Document Non-Identification Policy and Document-Level Exemption Policy in Counts Eighteen and Twenty, respectively, of No. 11-445. These claims allege that, at the administrative level, the CIA has a policy of never identifying documents withheld in their entirety and only specifying exemptions at a document level, rather than specifying the exemption claimed for each particular redaction. *See* FAC ¶¶ 118–122, 128–133, *NSC III*.

In responding to a FOIA request, agencies are obligated to determine "whether to comply with such request" and must notify the requester of, *inter alia*, the reason for the determination. 5 U.S.C. § 552(a)(6)(A)(i). If the agency decides to withhold any responsive records, it also must "make a reasonable effort to estimate the volume of any requested matter the provision of which is denied" and provide that estimate to the requester. *Id.* § 552(a)(6)(F). Finally, if an agency decides to release records with certain portions redacted, it must indicate on each document "[t]he amount of information deleted, and the exemption under which the deletion is made," and "[i]f technically feasible," the agency must also indicate this information "at the place in the record where such deletion is made." *Id.* § 552(b). The FOIA excuses agencies

from having either to "estimate the volume of" withheld records or indicate "[t]he amount of

information deleted, and the exemption under which the deletion is made," when compliance

with those procedures "would harm an interest protected by the exemption" being claimed.  *Id.*

§§ 552(a)(6)(F), 552(b).

In support of its challenge to the CIA's alleged Withheld Document Non-Identification

Policy and Document-Level Exemption Policy, the plaintiff cites a publicly available CIA

training manual, which states, "'at initial and at appeal stage, no listing of documents, or putting

specific exemptions next to redactions, is required." *Id.* ¶ 119.  The CIA believes the plaintiff's

challenges to these two alleged policies should be dismissed because (1) at least one court has

upheld the CIA's use of "no number, no list" responses for withholding documents at the

administrative stage in certain circumstances, and (2) an agency is permitted by the FOIA to

"refuse to specify the exemptions under which a deletion is made when appropriate," *i.e.*, "if

including the indication would harm an interest protected by the exemption."  *See* Defs.' 445

Mem. at 17–18.

The plaintiff, however, argues that agencies are required to identify documents that are

withheld at the administrative level, relying heavily on a nearly 35-year-old Texas district court

case called *Shermco Industries, Inc. v. Secretary of U.S. Air Force*, 452 F. Supp. 306 (N.D. Tex.

1978), *rev'd on other grounds*, 613 F.2d 1314 (5th Cir. 1980).  *See* Pl.'s 445 Opp'n at 18–19.

The court in *Shermco* stated in dictum that:

> It would be impossible for a requesting person to effectively appeal an agency
> decision through the administrative process with any hope of changing the
> agency's mind if the person were denied access to adequate information about the
> adverse decision. A person cannot effectively appeal a decision about the
> releasability of documents or the charging of fees if he is not informed of at least
> a list of the documents to which he was denied access, what fees he will be
> charged for releasable documents, and why those decisions were made. Denial of
> this information would in all likelihood be a violation of due process as well as

effectively gutting the reasons for applying the exhaustion doctrine in FOIA cases.

*Shermco*, 452 F. Supp. at 317 n.7 (citing U.S. CONST. amend. XIV).  The plaintiff further argues that, although agencies are not required to indicate exemptions if doing so would "harm an interest protected by the exemption," such actions "must be exercised on a case-by-case basis, and a blanket policy of refusing to do so presumes that *all* indications would harm protected interests."  Pl.'s 445 Opp'n at 19–20.

First, Count Eighteen in No. 11-445, challenging the alleged Withheld Document Non-Identification Policy, fails to state a cognizable claim under the FOIA.  Earlier this year, this Court held that "[t]he plain text of the [FOIA] does not require agencies to provide a list of withheld documents, but only to make a reasonable effort to estimate the volume of the documents withheld."  *Mobley v. Dep't of Justice*, 845 F. Supp. 2d 120, 124 (D.D.C. 2012). Although the plaintiff may be correct that the administrative process would be more meaningful if agencies were required to identify withheld documents at the administrative stage, those arguments are better directed at the political branches. The Judiciary's powers are limited to saying what the law is, and it would be inappropriate for the Court to add a substantial procedural requirement to the FOIA when there is no indication that Congress intended such a requirement to exist.  This result may or may not "rob the requester of his ability to intelligently appeal any decisions at the administrative level," Pl.'s 445 Opp'n at 19, but Congress elected not to grant requesters that ability.  Instead, the FOIA provides requesters with the opportunity for *de novo* judicial review of all withholding decisions—an ample and powerful procedural mechanism.  *See* 5 U.S.C. § 552(a)(4)(B); *see also Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 402 F. Supp. 460, 463 (D.D.C. 1975) ("While the [agency's] identification might have been more detailed at an earlier [administrative] stage, the foregoing descriptions [in agency

affidavits] are adequate for this de novo Court action.").  Therefore, the plaintiff's challenge to

the alleged Withheld Document Non-Identification Policy (Count Eighteen in No. 11-445) will

be dismissed for failure to state a claim.

Next, Count Twenty in No. 11-445, challenging the alleged Document-Level Exemption

Policy, succeeds in stating a claim for relief based on the CIA's stated policy.  The plaintiff

concedes that an agency need not indicate the exemptions under which it redacts information at

all when "including the indication would harm an interest protected by the exemption."  Pl.'s 445

Opp'n at 19.  Rather, the plaintiff's sole contention in its brief is that the CIA is invoking

exemptions on a document level pursuant to a "blanket policy," rather than doing so on a case-

by-case basis.  *Id.* at 19–20. Two factual allegations support this claim.  First, the plaintiff claims

that "[i]n every case in which CIA has redacted information from records released in response to

an NSC FOIA request . . . CIA has consistently invoked exemptions on a document-level without

indicating which exemptions applied to which particular redactions."  FAC ¶ 129, *NSC III*.

Habitually invoking exemptions for redactions on a document level, however, is not inconsistent

with doing so on a case-by-case basis.  *See Iqbal*, 556 U.S. at 678 (complaint must plead facts

that are more than "'merely consistent with' a defendant's liability").  Standing alone, these

decisions by the CIA—"consistent[]" as they may be—do not demonstrate a plausible claim

regarding a "blanket" policy.

Second, however, the plaintiff alleges the existence of a publicly available CIA training

manual, which states that "at initial and at appeal stage," FOIA officials at the CIA need not

"put[] specific exemptions next to redactions."  FAC ¶ 119, *NSC III*.  The CIA does not contest

that this training manual constitutes an official agency policy regarding the specification of

exemptions in redacted documents, but rather it argues that "an agency may, consistent with the

FOIA, refuse to specify the exemptions under which a deletion is made when" including the indication "would harm an interest protected by the exemption."  Defs.' 445 Mem. at 18.  The only statutory language cited and discussed by the defendant, however, fails to address the substance of the plaintiff's allegation.  The defendant cites a provision of the FOIA that requires agencies to indicate the exemption under which a deletion is made "on the released portion of the record."  5 U.S.C. § 552(b).  This provision, however, only governs an agency's duty to indicate the exemption for a given deletion *at all*, while the plaintiff more particularly challenges the CIA's failure to specify exemptions *at a redaction level*, as opposed to a document level. That duty is covered by the very next sentence of the FOIA statute, which neither party has cited or discussed.  That sentence provides:  "If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made."  *Id.*  Presuming as true the plaintiff's uncontested allegation that the CIA training manual represents an official CIA policy, that policy runs roughshod over this statutory language by applying a blanket presumption that exemptions need not be specified "next to redactions."  *See* FAC ¶ 119, *NSC III*.  Therefore, the plaintiff has stated a claim for relief in its challenge to the CIA's alleged Document-Level Exemption Policy (Count Twenty in No. 11-445) because a blanket policy of refusing to specify exemptions "next to redactions," without considering the technical feasibility of doing so, would violate the CIA's

duties under the FOIA.[37]   Thus, the defendant's partial motion to dismiss in No. 11-445 will be

denied with respect to Count Twenty.[38]

> **6.**     ***Blanket Processing Notes Exemption Policy and Blanket Reference Material Exemption Policy***

The Court next considers the plaintiff's challenge to the CIA's alleged Blanket

Processing Notes Exemption Policy and Blanket Reference Material Exemption Policy,

contained in Counts Four and Eleven of No. 11-445, respectively.   In those claims, the plaintiff

alleges that, in response to FOIA requests, the CIA improperly applies blanket exemptions to

(1) "all information pertaining to [the CIA's] processing of FOIA and Privacy Act requests" and

(2) "all FOIA/[Privacy Act] reference materials."   FAC ¶¶ 35, 79, *NSC III*.   By "blanket

exemption," the plaintiff appears to mean that, when the plaintiff requests processing notes or

reference materials about particular FOIA or Privacy Act requests, the CIA "has withheld

everything from the release except for correspondence with the requester."   *Id.* ¶ 33.

Construing the plaintiff's allegations in the most favorable light, the plaintiff's claim is

that this alleged policy or practice violates the FOIA because it is "blanket" in nature, *i.e.*, that

the CIA is reflexively and categorically withholding all processing notes and reference materials

without actually assessing the material on a record-by-record basis.   *See* Pl.'s 445 Opp'n at 14–

15 (arguing that the CIA's "blanket" policy and its "sweeping generalizations" in support of that

policy are "reminiscent of the days before *Vaughn* indices were required components of any

FOIA litigation").   The plaintiff attempts to buttress this theory in its opposition brief by citing to

---

[37] To the extent that the plaintiff claims, however, that the CIA has failed to give case-by-case consideration to its decision of whether to indicate exemptions *at all* in redacted documents, the plaintiff's claim fails.   The plaintiff has not alleged any facts that would plausibly suggest that the CIA has a policy of refusing to indicate exemptions in redacted documents without case-by-case consideration of whether such indication "would harm an interest protected by the exemption."

[38] The plaintiff has failed to state a claim for relief in Count Twenty, however, insofar as it claims that, when the "CIA has withheld records in their entirety in response to an NSC FOIA request," the CIA "has consistently invoked exemptions in the alternative."   FAC ¶ 128, *NSC III*.   The FOIA does not prohibit an agency from invoking exemptions in the alternative when the agency withholds records from disclosure.

what the plaintiff claims is the "only CIA FOIA processing notes released to any requester,"
which the plaintiff says demonstrates the "mundane" and non-exempt nature of these materials.
*See id.* at 15–16.  The plaintiff's claim, however, suffers from fatal defects in pleading and logic.

As discussed above in connection with County Twenty, the plaintiff's allegations in
Counts Four and Eleven fail to distinguish between consistent decisionmaking on the one hand
and a lack of case-by-case consideration on the other.  Although the plaintiff alleges in Count
Four that, in response to twelve of thirteen FOIA requests for processing materials, the CIA
"withheld everything from the release except for correspondence with the requester," FAC ¶ 33,
*NSC III*, the plaintiff offers no allegation to suggest that this was not the result of case-by-case
consideration.[39]  Unlike in Count Twenty, the plaintiff offers no factual allegation that the CIA
has an actual policy of categorically exempting such records.  The plaintiff's logic is that,
because the processing notes that were released are "mundane," there must be other such
releasable material "in all the various FOIA requests for which notes have been processed for
release."  Pl.'s 445 Opp'n at 16.  Yet, logic would seem to militate toward the opposite
conclusion, *i.e.*, that the "mundane" processing notes were the only such notes released precisely
*because* they are the exception, rather than the rule and precisely *because* the CIA is considering
the release of processing notes on a case-by-case basis.  Indeed, if the CIA had such a "blanket"
policy, logic would seem to suggest that these "mundane" processing notes would have been
withheld, rather than produced.  Despite all of this, the plaintiff's only explanation for why these
processing notes were released is that they represent an "inexplicabl[e] deviat[ion] from [the
CIA's] pattern," but such thinking begs the question.  Pl.'s 445 Opp'n at 15.

---

[39] The plaintiff also offers no factual allegations whatsoever to support its claim in Count Eleven.  The plaintiff
merely offers the conclusory assertion that the CIA has made a "decision to apply a blanket exemption to all
FOIA/[Privacy Act] reference materials," which violates the FOIA.  FAC ¶ 79, *NSC III*.  This allegation is patently
insufficient to state a plausible claim for relief.

Even setting aside the plaintiff's apparent logical fallacies, however, the fact remains that the plaintiff has failed to allege any facts that would plausibly suggest that the CIA has categorically exempted FOIA processing notes or reference materials without case-by-case consideration.[40]  The plaintiff also has not alleged that the CIA failed to comply with the other required procedures of the FOIA in withholding these records, such as disclosing the estimated volume of the records withheld and identifying which exemptions apply to the withheld documents.  Absent allegations that would plausibly suggest an ongoing violation of the FOIA, the plaintiff's challenges to the Blanket Processing Notes Exemption Policy and Blanket Reference Material Exemption Policy (Counts Four and Eleven in No. 11-445) will be dismissed for failure to state a claim.[41]

### 7.     *Glomar Response Policy*

Finally, the Court will address the plaintiff's challenge to the CIA's alleged *Glomar* Response Policy.  "'[A]n agency may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under a FOIA exception.'"  *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)).  These responses are known as *Glomar* responses.  *See Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976).  "If, however, the agency has officially acknowledged the existence of the record, the agency can no longer use a *Glomar* response and instead must either: (1) disclose the record to the requester or (2) establish that its contents are exempt from disclosure and that such exemption has not been waived."  *Moore*, 666 F.3d at 1333 (citation

---

[40] Hence, the Court need not reach the question of whether FOIA processing or reference materials would actually enjoy categorical exemption.

[41] The Court need not reach the question of whether the plaintiff would succeed in stating a claim if it had alleged facts to support the notion that the CIA was failing to give case-by-case consideration to its withholding decisions. It is sufficient to hold that a plaintiff alleging a policy or practice of "blanket" or categorical decisionmaking by FOIA administrators must allege facts that plausibly suggest a widespread lack of individual consideration, as opposed to a pattern of consistently deciding cases in a particular way.

omitted) (citing *Wolf*, 473 F.3d at 378–80).  "[I]n order to overcome an agency's *Glomar* response based on an official acknowledgement, the requesting plaintiff must pinpoint an agency record that both matches the plaintiff's request and has been publicly and officially acknowledged by the agency."  *Id.*

The plaintiff alleges that the CIA has a policy or practice of "authoriz[ing] a *Glomar* response to any requests for information pertaining to FOIA and [Mandatory Declassification Review] requests referred to [it]."  FAC ¶ 96, *NSC III*.  In particular, the plaintiff alleged two examples of this policy where the CIA has issued a *Glomar* response to FOIA requests for documents pertaining to particular FOIA and Mandatory Declassification Review ("MDR") requests,[42] despite the prior disclosure of referral memoranda from the CIA and correspondence between the CIA and the plaintiff regarding these requests.  The plaintiff alleges that the referral memoranda were disclosed by the National Archives and Records Administration, and the plaintiff alleges that it is in possession of the correspondence because it was the party corresponding with the CIA.  FAC ¶ 95, *NSC III*.

The plaintiff's allegations challenging the CIA's *Glomar* Response Policy sweep very broadly.  *See* FAC ¶ 96, *NSC III* (alleging a policy "that authorizes a *Glomar* response to any request for information pertaining to FOIA and MDR requests referred to an agency").  Construing the plaintiff's claim most broadly, the plaintiff is complaining that, even when other federal agencies acknowledge the existence of responsive CIA records by referring FOIA requests to the CIA, the CIA has a policy of nevertheless issuing *Glomar* responses post-referral.  In other words, Agency A says that Agency B has records responsive to a FOIA request, but Agency B says it can neither confirm nor deny that it has any such records.  If this is what the

---

[42] An MDR request is a request from a member of the public to have a document or documents declassified so that they can be released to the public.  *See generally* Exec. Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009).

plaintiff claims, however, that claim fails as a matter of well-established FOIA law.  The D.C.

Circuit has consistently held that, for purposes of a *Glomar* response, it "do[es] not deem

'official' a disclosure made by someone other than the agency from which the information is

being sought."  *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999); *see also Marino v. DEA*,

685 F.3d 1076, 1082 (D.C. Cir. 2012) ("[A]n agency does not waive its right to invoke an

otherwise valid FOIA exemption when 'someone other than the agency from which the

information is being sought' discloses it." (quoting *Frugone*, 169 F.3d at 774)); *Moore*, 666 F.3d

at 1333 n.4 ("[T]o the extent [appellant] suggests that the release of the [record] *by the FBI*

constitutes an official acknowledgement *by the CIA*, his argument is foreclosed by our

precedent." (citing *Frugone*, 169 F.3d at 774–75)).

The plaintiff's claim could, however, also be construed more narrowly.  Under a

narrower construction, which is supported by the context provided in the plaintiff's briefing, the

plaintiff claims that when certain records associated with a FOIA request are publicly released

(*e.g.*, referral memoranda or correspondence with the requester), the responding agency is then

foreclosed from issuing a *Glomar* response as to other records associated with that same request

(*e.g.*, processing notes).  Indeed, the plaintiff argues, with a hint of exasperation, that "[i]t is

nonsensical to propose that CIA can write an official letter to a requester acknowledging a

referred request (or even releasing material), but that if the same requester files a FOIA request

for CIA's processing notes regarding the very same referred request, he will be issued a *Glomar*

response."  Pl.'s 445 Opp'n at 18.  Although the plaintiff may find it "nonsensical," the D.C.

Circuit has clearly held that courts must apply the "official acknowledgement" exception

"strictly," such that the "official acknowledgement" only extends to the specific records that are

acknowledged by the agency.  *See Moore*, 666 F.3d at 1333; *Wolf*, 473 F.3d at 378–79; *see also*

*Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 70 (2d Cir. 2009) (agency is "precluded from making a

*Glomar* response if the existence or nonexistence of the *specific records* sought by the FOIA

request has been the subject of an official public acknowledgement" (emphasis added)). Indeed,

this Circuit requires that a plaintiff "*pinpoint* an agency record that both matches the plaintiff's

request and has been publicly and officially acknowledged by the agency." *Moore*, 666 F.3d at

1333 (emphasis added). Thus, even assuming *arguendo* that the disclosure of the CIA's referral

memoranda and correspondence regarding certain referred requests would qualify as "official

acknowledgements," that still would not make it improper for the CIA to refuse to confirm or

deny the existence of processing notes from those very same requests because the processing

notes are separate documents from the referral memoranda and correspondence. The fact that

they are separate documents makes all the difference under *Moore* and *Wolf*.

   The plaintiff does not claim that the CIA has issued *Glomar* responses with respect to

particular documents that have been officially acknowledged by the CIA. Rather, the plaintiff's

theory appears to be that, once an agency acknowledges that a particular request was made, such

a statement waives the agency's ability to issue a *Glomar* response with regard to *any* documents

associated with that request. As logical as this may seem to the plaintiff, it is simply not the law.

*See Wolf*, 473 F.3d at 378 (holding that the official acknowledgement doctrine imposes an

"insistence on exactitude" under which "the *specific* information sought by the plaintiff must

already be in the public domain by official disclosure"); *see also Students Against Genocide*

*(SAGE) v. Dep't of State*, 50 F. Supp. 2d 20, 25 (D.D.C. 1999) ("[T]here is certainly no 'cat out

of the bag' philosophy underlying FOIA so that any public discussion of protected information

dissipates the protection which would otherwise shield the information sought."). Therefore,

because the conduct that the plaintiff alleges would not violate the FOIA, the plaintiff's

challenge to the CIA's alleged *Glomar* Response Policy (Count Fourteen in No. 11-445) will be dismissed for failure to state a claim.

## IV.   CONCLUSION

For the reasons discussed above, in summary, the Court rules on the CIA's partial motions to dismiss the plaintiff's policy-or-practice claims as follows:

1.  The plaintiff's challenge to the CIA's alleged Assignment of Rights Policy may go forward because the plaintiff has standing to pursue it.

2.  The plaintiff's challenges to the CIA's alleged Aggregate Data Policy under the FOIA, the APA, and the Mandamus Act are all dismissed.

3.  The plaintiff's challenges to the CIA's alleged Administrative Appeals Policy under the FOIA, the APA, and the Mandamus Act are all dismissed.

4.  The plaintiff's challenges to the CIA's alleged Reasonably Describe Policy under the FOIA, the APA, and the Mandamus Act are all dismissed.

5.  The plaintiff's challenges to the CIA's alleged Work With Policy under the FOIA, the APA, and the Mandamus Act are all dismissed.

6.  The plaintiff's challenge to the CIA's alleged Cut-Off Date Policy under the FOIA may go forward because it succeeds in stating a claim for relief.

7.  The plaintiff's challenge to the CIA's alleged Blanket Processing Notes Exemption Policy under the FOIA is dismissed.

8.  The plaintiff's challenge to the CIA's alleged Blanket Reference Material Exemption Policy under the FOIA is dismissed.

9.  The plaintiff's challenge to the CIA's alleged *Glomar* Response Policy under the FOIA is dismissed.

10. The plaintiff's challenges to the CIA's alleged Non-Provision of Completion Date Policy under the FOIA, the APA, and the Mandamus Act are all dismissed.

11. The plaintiff's challenges to the CIA's alleged Withheld Document Non-Identification Policy under the FOIA and the APA are both dismissed.

12. The plaintiff's challenge to the CIA's alleged Document-Level Exemption Policy under the FOIA may go forward because it succeeds in stating claim, but the identical challenge under the APA is dismissed.

With respect to the specific Counts in the three complaints, the CIA's motion to dismiss Counts One and Two of No. 11-443—related to the CIA's Assignment of Rights Policy—is denied.  Additionally, the CIA's partial motion to dismiss in No. 11-444 is denied with respect to the plaintiff's FOIA challenge to the CIA's alleged Cut-Off Date Policy (Count Twenty-One) and is granted with respect to all APA claims (Counts Three, Six, Twelve, and Fifteen), all Mandamus Act Claims (Counts Four, Seven, Thirteen, and Sixteen), and all remaining challenges to the Aggregate Data Policy (Count Two), Administrative Appeals Policy (Count Five), Reasonably Describe Policy (Count Eleven), and Work With Policy (Count Fourteen). Finally, the CIA's partial motion to dismiss in No. 11-445 is denied with respect to the FOIA challenge to the CIA's alleged Document-Level Exemption Policy (Count Twenty) and is granted with respect to all APA claims (Counts Sixteen, Nineteen, and Twenty-One), the Mandamus Act Claim (Count Seventeen) and all remaining challenges to the Blanket Processing Notes Exemption Policy (Count Four), Blanket Reference Material Exemption Policy (Count Eleven), *Glomar* Response Policy (Count Fourteen), Non-Provision of Completion Date Policy (Count Fifteen), and Withheld Document Non-Identification Policy (Count Eighteen).

An appropriate Order accompanies this Memorandum Opinion.

Date: October 17, 2012

/s/ *Beryl A. Howell*

BERYL A. HOWELL
United States District Judge